Sam DELK, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Oct. 9, 1979.

Petition to Rehear Denied Dec. 3, 1979.

Jerry C. Colley, Columbia, Philip M. Carden, Nashville, for petitioner.

William M. Leech, Jr., Atty. Gen., Willaim O. Kelly, Asst. Atty. Gen., Nashville, Elmer Davies, Dist. Atty. Gen., Franklin, Douglas T. Bates, III, Asst. Dist. Atty. Gen., Centerville, for respondent.

## OPINION

FONES, Justice.

Defendant was convicted, on circumstantial evidence, of murder in the second degree and sentenced to fifty years in the penitentiary. The Court of Criminal Appeals affirmed, and we granted the writ of certiorari.

Harry Gibson, owner of Gibson's Wayside Market in Centerville, was killed by one of two shots fired from a .32-caliber weapon on November 12, 1975. He was alive and apparently alone when Sidney Pigg, a 13-year-old customer, left his store at approximately 5:54 p. m. His body was found just inside the front door, a few minutes prior to the placing of a call to the police dispatcher, which call was received at 6:09 p. m. When the body was discovered the telephone was off the hook, and the adjacent cash register was open. The investigators found over six hundred dollars in cash in the register and five hundred and one dollars in cash on the victim.

### I.

The State's theory was that defendant entered the store after Pigg left and shot Gibson. Motivation was said to arise from the fact that months prior to the murder, defendant had damaged a door during a scuffle at Harry Gibson's Tavern, located three hundred and fifty-feet south on Columbia Avenue from the market, and defendant was required to and did pay for the damage, but that he probably owed Gibson

for beer or cigarettes, evidenced by the fact that he was seen on several occasions giving money to friends in front of the market, who entered the market, purchased cigarettes and delivered them to defendant. The murder weapon was not found, no fingerprints were introduced and no witness testified that any shots were heard. The only additional evidence of any significance relied upon by the State was the discovery, on the morning of November 13, 1975, of blank checks, bad checks, receipts, recipes and miscellaneous scraps of note paper, some of which were facially identified with Gibson's Wayside Market but most of the papers were totally unidentifiable and the record leaves them to speak for themselves. The papers were found by Rose Claiborne near her mailbox just off the roadway in front of her residence. She lived on Highway 100 just across the Duck River Bridge between Centerville and Dickson, on the right-hand side of the road for traffic proceeding toward Dickson from Centerville. There was testimony that Dan Delk, defendant's twin brother, and defendant were alone together on one or more occasions during the evening of the murder and that Dan Delk had left Centerville for Dickson driving his vehicle, with three females as passengers. Two of the three passengers testified that at or near the Claiborne residence his right wheel or wheels left the pavement for a short distance, but that he regained control, returned to the pavement and continued on without stopping. They disagreed as to the source of the distraction that caused him to "kinda slip off the road." One of the witnesses testified that it was cold and that all of the windows were closed, and that the vent window on the driver's side was taped closed. Nevertheless, it was the State's theory that defendant had taken the worthless papers from the market, gave them to Dan Delk when he had the opportunity during the evening and Dan Delk threw them out the window when he left the pavement momentarily.

Defendant did not testify and did not adduce any proof. He made a voluntary oral statement to the Sheriff on the afternoon of November 13, 1975, after *Miranda*

warnings had been given and he had waived his rights.

The Sheriff's testimony revealed that defendant told him that he had left his home on Wells Street, where he resided with his parents, walked down the left side of Columbia Avenue toward Gibson's Market and saw Sidney Pigg on the east side of the street, a short distance south of the market. He was asked, "What's happening?", responded, "You got it," continued on, crossed Columbia Avenue and entered the market. Defendant had told the Sheriff that Gibson was talking on the telephone, that he got a package of cigarettes and one or two boxes of matches, gave Gibson a five dollar bill, that Gibson reached over to the cash register and gave him four dollars, forty-eight cents change and never put the telephone down; that defendant left the store, having been inside between thirty- and forty-five seconds, and denied killing Gibson. According to the Sheriff, defendant said that he then walked down the east side of Columbia Avenue to Gibson's Tavern, and his arrival there was confirmed by other State witnesses at an approximate time not inconsistent with the theories of either defendant or the State.

The State also brought out on the direct examination of the Sheriff that defendant had denied that there was any animosity or bad feelings between Gibson and himself and denied ever owning a handgun.

Defendant's theory was that Gibson was alive and talking on the telephone when he left the market and that someone entered thereafter, committed the foul deed and escaped unnoticed, probably into the brush and woods behind the market through the side yard between the market and the Small house.

Mr. Small lived in the first house south of the market with only twenty feet of open space between the buildings. Louise Chavers and her husband lived in the second house south of the market, with a side yard approximately thirty-nine-feet wide between the Chavers and the Small houses. Mr. Small boarded with the Chavers, and Mr. Chavers owned the Small house. Defendant told the Sheriff that as he walked away from the store he looked into the side yard between the Small and Chavers houses, that he saw Louise Chavers walk from her rear door to a side door in the Small house and call Mr. Small to "come eat." He said that about half-way across the side yard, Mrs. Chavers looked straight at him and he looked straight at her.

Louise Chavers testified that she was in the kitchen, the news came on, she looked at the clock and it was straight up and down six o'clock; that she went out the rear door that opened into a garage, and across the side yard to Mr. Small's door, called him; and when he didn't answer, she opened the door and again said "Your supper is ready," whereupon he responded. She said that as she left the corner of her garage, she looked toward Columbia Avenue and at an angle to two old abandoned trucks belonging to her husband which had been parked in front of the Small house for more than two years, and indicated that she usually did that when it was dark because she was scared that someone might be hiding out in or around the trucks. However, on that occasion she testified that she saw no one and that she did not see defendant walking along the street. After calling Mr. Small, Mrs. Chavers returned to her house by the same route, went to the stove and turned off something she was cooking and heard a car horn blow. She went to the front door and saw Floyd Stone sitting in his vehicle in front of the Walker house, which was located diagonally across the street and to the south of the AME Church. Mrs. Chavers later reenacted her activities between six o'clock and her hearing the horn blown, and the Sheriff timed this interval at one minute, seventeen seconds.

Floyd Stone picked up "Goon" Gilbert at the Walkers to take him to a clinic. He had a toothache and his jaw was swollen. Leaving from the Walkers, they circled behind the AME Church, and as they were making the ninety-degree left turn into Columbia Avenue to go north, they were looking almost directly into the front glass doors of the market when Gilbert saw Gibson's body

on the floor. A later reenactment of the interval from the blowing of the horn for Gilbert to exit the Walker house until they entered the store was timed at one minute fifty seconds. Floyd Stone estimated he placed the call to the police three to five minutes after they entered the store.

· If Louise Chavers starting time was correct and all of the witnesses involved in the reenactments, memories and actions were correctly recalled and reenacted, Stone and Gilbert entered the store at 6:03:17 p. m., and did not call the police until five minutes · and forty-three seconds later.

Burford Hornbeak said he left the market at 5:50 p. m., and looked at his watch which kept good time. Sidney Pigg testified at the trial that he left five minutes later, but admitted that his estimate, made at the preliminary hearing ten days after the murder, had been three to five minutes. Using the median of four minutes, defendant would have entered the store at 5:55:20 p. m. Time reenactments revealed that Pigg required thirty-five seconds to reach the point of conversation with defendant and it was estimated that defendant would have required forty-five seconds to cross Columbia Avenue and enter the store. This analysis of the evidence reveals. that the murder occurred within the seven minute, fifty-seven-second-interval between 5:55:20 and 6:03:17 p. m. If defendant was in the market only forty-five seconds and did not kill Gibson, seven minutes and twelve seconds remained for the killer to accomplish the act and escape before discovery of the body.

## II.

The last of twenty-seven witnesses called by the State was Ulysses Gibson, the victim's brother. He testified that Jones Delk, the defendant's father, came into the market a few months prior to the murder, with a sack full of bullets, and he was asked: (1) what did Jones Delk do with the bullets and (2) what color were the bullets. Defendant objected and during a colloquy between the Court and counsel, the prosecuting attorney said, "Well I can tie it in." Thereupon,

upon defendant's motion the jury was excused. While the jury was out, Ulysses Gibson testified that Jones Delk "had a sack with a whole box of shells in it, bullets and he showed them to me and my brother . . .", and that Delk said, "I guess I'll give old Sam two or three of these." The most positive answer elicited from Ulysses Gibson when several attempts were made to ascertain how long before the murder that Jones Delk showed the bullets was, "It wasn't too awfully long." The trial judge eventually sustained the objection, and defense counsel asked that he instruct the jury to disregard the last question and answer they had heard, but when the Court announced he couldn't remember the last question and answer, the request was withdrawn.

The Court of Criminal Appeals held that there was no basis for that evidence and when the prosecuting attorney said in the presence of the jury that he could tie it in, he came "perilously close to creating a situation where the jury might be improperly influenced." But the intermediate Court concluded it was harmless error.

Also cited as errors on the basis of alleged misconduct by the prosecuting attorney were two instances in the course of the trial when he asked, "Have you ever seen Sam Delk with a handgun in his possession?" That question was first asked of Wright Fowlkes, objected to by defense counsel and sustained as to form, whereupon the prosecuting attorney asked that the jury be excused. However, before the objection was made, the witness had already answered with an unequivocal, "No." With the jury out the Court explained that the objection was sustained, "On the basis of the open-ended import of the word 'ever,'" and if rephrased to a specific recent time the objection might be cured. The prosecuting attorney said that a later witness would lay the foundation and asked that Fowlkes remain subject to recall. He was not recalled.

Eight witnesses later Wayne Dansby was asked the same question, defense counsel objected, and the prosecuting attorney said,

"I can show it now." The jury was excused on motion of defense counsel. The prosecuting attorney argued that since the Sheriff had testified that defendant said he never· owned a handgun, testimony to the contrary was admissible. Dansby was questioned further outside the presence of the jury and said he had "seen" defendant with a handgun twice. When asked how long before the murder, he said he couldn't remember but estimated eight to nine months. The prosecuting attorney then withdrew his efforts to pursue that line of questioning.

█ Defendant complains, in effect, that the Jones Delk bullets episode and the handgun possession episode involve the calculated use of questions for the purpose of planting in the minds of the jury the suggestion of the existence of damaging evidence against the defendant, and that except for some mysterious legal technicality would have been more fully adduced, when the prosecuting attorney knew, or should have known, that the evidence proffered would not meet the criterion for admissibility. As all trial lawyers know, such tactics are, strictly speaking, improper but are rather widely used and generally condoned by the courts, with varying degrees of frowning. Prosecuting attorneys should be on notice that they are taking a calculated risk that may result in· reversal, if the use of such tactics improperly influence the jury to the prejudice of the defendant.

### III.

All of the testimony about the papers found by Rose Claiborne was objected to by defendant, and its admission is assigned as error. Defendant insists that there is no evidence that anything was taken from the market by defendant or anyone else, at the time of the murder or that defendant passed anything to his brother to be disposed of. Further, he insists there is no explanation of how Dan Delk managed to

throw papers out of his vehicle when the testimony of two of his passengers negated that possibility, nor was there any rational explanation of how the papers could have landed on the right side of the road if Dan Delk threw them out the window on the driver's side.

█ The testimony of Rose Claiborne that she found the papers on the morning of November 13, 1975, and that they were not there at 11:30 p. m. on November 12, was relevant. Some of the papers belonged to Harry Gibson, individually[1], and some were clearly associated with the operation of Gibson's Wayside Market. The time of their appearance on Rose Claiborne's property gave rise to an inference that they may have been taken by the killer of Harry Gibson. Likewise, it was relevant to show that defendant had the opportunity to hand any papers he may have taken from the market to his brother, Dan Delk, and .that Dan Delk traversed the road .past Rose Claiborne's house during the time frame of their appearance at that place. It follows that the State was entitled to ask the passengers in Dan Delk's vehicle what occurred when they passed Rose Claiborne's house. The fact that the State failed to elicit from the two passengers testimony that Dan Delk did in fact throw papers from the car, does not render their testimony inadmissible, but merely goes to the probative value of the State's theory of defendant's complicity in the episode, as is the case with all of the alleged evidentiary errors involving the papers found at Rose Claiborne's.

We agree with defendant that there is no evidence in this record that defendant personally drove or rode past Rose Claiborne's house that evening, as indicated in the Court of Criminal Appeals' opinion.

### IV.

During rebuttal argument the prosecuting attorney said, in part, the following:

1. (1) A 1975 American Legion membership card; (2) a satisfactory chest x-ray report dated February 4, 1974; (3) a food handler's certificate dated June 25, 1974; and (4) two insur-

ance premium receipts in the sum of twenty-five dollars each, one to policyholder Eugene H. Gibson and one to Georgia H. Gibson, both dated October 17, 1975.

"Mr. Colley says about these checks I don't have to explain them, I don't have to explain them, well he doesn't have to explain them but he had available to him and I don't know whether he is in the courtroom, yes he is, he had available to him all week Dan Delk, Dan Delk was here all week and could have been called to explain those checks, why wasn't he called?

MR. COLLEY: Note my exception to this line of argument."

The prosecuting attorney then said that he had a case in point, the Court asked to see the case and a law book was apparently handed to the Court, but the record fails to show any ruling made by the Court and the prosecuting attorney resumed his argument.

Defendant insists that Article I, § 9 of the Tennessee Constitution is broader than the fifth amendment to the United States Constitution and that the remarks quoted infringed upon defendant's right to remain silent and to decline to adduce any witnesses or proof whatever, including testimony of any witness or witnesses who might fall within the purview of the rule that failure to call an available witness, who knows material facts and is controlled by or would be naturally favorable to defendant, gives rise to an inference that the uncalled witness' testimony would not sustain the defendant's contentions.

No authority has been cited in support of that proposition other than the language of the Tennessee Constitution. The prohibition in our Constitution is that an accused shall not be compelled to give *evidence* against himself, whereas the language in the federal constitution is that the accused shall not be compelled to be a *witness* against himself. We do not agree that the Tennessee prohibition against self-incrimination is broader or different in any application thereof because of the use of the word "evidence" instead of the word "witness."

However, the comment on defendant's failure to produce Dan Delk as a witness was improper, in the absence of evidence laying a proper foundation for such comment.

There was no basis in the proof adduced at the trial for the prosecutor's statement to the jury that Dan Delk was in the courtroom or had been available all week to testify. What the prosecuting attorney may have known of his own personal knowledge or observed in the courtroom cannot be considered part of the evidence in the case. As a predicate for comment on a missing witness, the evidence must show that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for the trial. *Cf. City of Lawrenceburg v. Maryland Cas. Co.,* 16 Tenn.App. 238, 64 S.W.2d 69 (1933).

V.

While we agree with the trial judge and the Court of Criminal Appeals that defendant's motion for a directed verdict was not well taken and that the State's proof was sufficient to present a jury issue as to defendant's guilt or innocence, we do not hesitate to observe that the margin by which the State prevailed was small. Since the case may be retried, we do not think it appropriate to undertake in detail the analysis of the proof that led us to that conclusion. Suffice it to say that we do not agree with the State's position that defendant's statement about what he saw and heard Louise Chavers do was damaging to his contention. In fact, his statement made to the Sheriff at a time when he had no knowledge of what, if anything, Sidney Pigg or Louise Chavers had said, reconciles remarkably with their testimony.

In the context of our evaluation of the proof in this case, we think the issues discussed in sections II and IV, cumulatively, resulted in prejudicially influencing the jury against defendant and requires that the conviction be reversed and the cause remanded for a new trial.

## VI.

The dissent filed in this case, subsequent to consideration of the first five sections of this opinion by all members of the Court, requires a response.

A further analysis of the time of death and the time of defendant's presence in Gibson's Market is in order. On the basis of the analysis narrated in section one, it was possible that seven minutes and twelve seconds was available for some third person to commit the murder, if defendant did not. We thought it self-evident that the jury could have found that less than three minutes or perhaps even only two minutes remained between the time defendant left the store and the time the body was seen by Gilbert, when the Stone car stopped in the church driveway before entering Columbia Avenue and further that because of potential eye-witnesses, anyone entering or leaving the front door of the store would have been seen during that interval.

Defendant's statement to the Sheriff that he heard Louise Chavers' conversation with Small when only a few feet north of the store would mean that he left the store after 6:00, rather than at 5:55:20. Floyd Stone did not use the telephone in the store to call the police. He went to the Gray house located approximately two hundred ninety-nine feet north of the store, and as he passed the Walker house he took the time to inform them of the discovery of Gibson's body. The jury could have found that Gilbert and Stone entered the store earlier than 6:03:17 further narrowing the time and opportunity for anyone else to commit the murder.

It is undisputed that the two rear doors of Gibson's Market were bolted and locked on the inside and were not tampered with, so that the murderer would have had to enter and leave by the front door.

During the interval of time that elapsed between defendant leaving the store and the finding of the body, the following events transpired. Louise Chavers went to her front door, hearing Floyd Stone's horn blow. The well-lighted front of Gibson's Market was fully visible to her from that vantage point as her testimony about defendant sending friends into the store to make purchases had made clear. She observed Gilbert and several others outside the Walker house and Floyd Stone sitting in his car parked in front of the Walker house. All of those persons at the Walker house had a clear view of the front of Gibson's Market, as did Gilbert and Stone as they circled behind the church except for a fleeting moment when the small church building would have blocked their view. Concededly, it is possible that all of those eyes that had the opportunity to see anyone else enter and leave Gibson's Market during the entire interval that defendant must rely on for his innocence were looking elsewhere, but the probabilities are almost nonexistent that such entry and exit occurred unobserved.

There was evidence from which the jury could have found that defendant did not arrive at Gibson's Tavern, three hundred and fifty feet from the murder scene until approximately 6:20 p. m.

It was established that a bundle of papers were taken from Gibson's Market and we think, beyond a reasonable doubt, that the taking occurred at the time of the murder. Among the papers were notations of amounts various persons owed Gibson and bad checks that had been given to Gibson and remained unpaid. The conclusion is inescapable that there was something among those papers that was more valuable to the murderer than the six hundred dollars cash in the open cash drawer. The jury could have found that defendant owed Gibson money for cigarettes, groceries, beer or the door that was damaged in the altercation "with his brother." The brother could have been Dan Delk, the record does not reveal whether defendant had other brothers.

The failure of defendant to call Dan Delk was significant for several reasons. One of the two women passengers who testified about his activities when his vehicle passed Mrs. Claiborne's house acknowledge that she had "stayed" with him and, of course, the other one was a friend. The jury was

not required to accept their testimony, which was far from convincing and unequivocal, on its face. Why would a defendant charged with a capital crime fail to put his available brother on the witness stand to state unequivocally that he was given no papers by defendant or anyone else on the night of the murder and that he did not deposit them beside the highway near Mrs. Claiborne's house? The answer may well be that he did so, or that he knew that defendant owed Gibson money and there was bad blood between them, or both.

█ There is no question but that the failure of defendant's brother to testify and the prosecutor's effective comment on it in rebuttal argument was a hard blow to defendant. However, it is true, as the dissenter observes, that the three errors are normally treated as harmless, certainly each standing alone. But it is also true that the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt. The dissenter characterizes this case as proving nothing but presence. The proof of presence and the opportunity to commit the murder, with no eye-witness to the killing, was conclusive and was coupled with a time sequence that would support a finding beyond a reasonable doubt that no one else could have entered the store, committed the crime, and left unobserved.

Reversed and remanded for a new trial.

BROCK, C. J., and COOPER and HARBISON, JJ., concur.

HENRY, J., dissents.

HENRY, Justice, dissenting.

I respectfully dissent.

If mere presence or opportunity will provide sufficient evidence upon which to convict, then this conviction should stand. If it will not, it should be reversed.

I.

*Presence of Accused*

In view of the fact that this conviction rests solely on presence and is based upon the proposition that Sam Delk *could* or *might* have committed the murder, we look to the character of the neighborhood to ascertain whether it *could* or *might* have been committed by others.

This murder occurred in Gipson's Wayside Market in Centerville, the county seat of Hickman County. According to the Tennessee Blue Book, 1977–1978, Centerville had a population of 2,697 persons. Gipson's Market is located on the east side of Columbia Avenue, a few blocks from the public square.

Examination of the exhibit pictures reveals that it is located in a thickly settled neighborhood, diagonally across the street from two churches. To the south of the market, on the east side of Columbia Avenue, there are six houses in the first block, including a beer joint owned by the deceased, but not including a trailer parked behind one of the houses. On the other side of the street, within the same block there are three houses and a Methodist church. Behind, and in immediate proximity to the church, on a road circling the church, there are six houses. On a side street or road just north of the market there are four houses, one of which appears to have been vacant. On the north side of the market, on Columbia Avenue before the road forks and within a block, there are four houses. On the opposite side of the road there are five houses and a Nazarene church.

In summary, within one block of the market there are *twenty-eight houses, two churches and one trailer.* These mundane figures take on significance in the face of a conviction based on the presence of the accused. Had this murder taken place at an isolated country store, the conviction based on the circumstance of presence would be more soundly based. But this murder took place in a busy market and "hanging out" place, located in a populous area within a county seat town, where customers and loafers are coming and going.

A criminal conviction may not be supported by suspicion alone because we are

governed by a standard that requires proof beyond a reasonable doubt. *United States v. Carter,* 173 U.S.App.D.C. 54, 522 F.2d 666 (D.C.Cir.1975). It is well settled that the mere presence of the accused at the scene of a crime does not, standing alone, justify drawing an inference of his participation or guilt. *Bailey v. United States,* 135 U.S. App.D.C. 95, 416 F.2d 1110 (D.C.Cir.1969); *Araujo-Lopez v. United States,* 405 F.2d 466 (9th Cir. 1969); *Newsom v. United States,* 335 F.2d 237 (5th Cir. 1964); *Glenn v. United States,* 271 F.2d 880 (6th Cir. 1959).

This conviction rests wholly on circumstantial evidence. The rule in Tennessee, as approved in *Overton v. State,* 521 S.W.2d 229, 232 (Tenn.Cr.App.1975), is that:

[T]he evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime. 521 S.W.2d at 232 quoting from *Pruitt v. State,* 3 Tenn.Cr.App. 256, 460 S.W.2d 385, 390 (1970)

*See also* T.P.I.Crim. 37.06.

As this Court held in *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610 (1971):

In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the *finger of guilt is pointed unerringly at the defendant and the defendant alone.* (Emphasis supplied). 470 S.W.2d at 613

This case is pregnant with the possibility that this defendant was an innocent victim and that someone else committed this murder. There was nothing conclusive about the State's proof; it did not exclude every other reasonable theory or hypothesis except that of guilt. In short, the defendant was not convicted beyond a reasonable doubt.

The fundamental nature of the governing reasonable doubt standard was eloquently articulated by the Supreme Court in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970):

"Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt." (citation omitted)

\*  \*  \*  \*  \*  \*

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty. 397 U.S. at 364, 90 S.Ct. at 1072–1073

The philosophy expressed in *Crawford, supra,* is pertinent:

"We cannot, in law or in conscience, affirm a judgment, when, after making all due allowance for the superior advantages of a jury, we can yet see that the jury were not warranted upon the facts in finding him guilty."

Thus, the Court cannot and will not sit idly by and, in effect, commit this defendant to the penitentiary when there remains a reasonable doubt that such judgment might be in error, and if upon a careful reading of the record of the trial court there is any doubt as to the guilt or the innocence of the defendant, such doubt must be weighed in favor of the defendant. 470 S.W.2d at 612–13 quoting from *Stuart v. State,* 60 Tenn. 178 (1873)

After having read this record *en toto,* twice,\* with painstaking care, reading parts of it on numerous occasions, after having

---

\* Since the revision and recirculation of the main opinion, I have reread the entire record.

prepared a written digest of the proof, and based upon many years of experience at both sides of the counsel table, I am impelled to the conclusion that the evidence presented in this case is insufficient to take this case to the jury and will not support a conviction.

## II.

### The Standard of Review

While I question the continuing relevance of our standard of appellate review in view of recent developments, I recognize in passing that under that standard, a jury verdict approved by the trial judge in a criminal prosecution thrusts upon the convicted defendant the burden of proving that the evidence preponderates against his guilt, *Martin v. State,* 542 S.W.2d 638 (Tenn.Cr. App.1976), and that this rule applies in circumstantial evidence cases, *State v. Townsend,* 525 S.W.2d 842 (Tenn.1975).

This standard, however, does not relieve the State from proving guilt beyond a reasonable doubt in the first instance. Moreover, it "presupposes record proof presenting a factual basis for consideration and determination by the jury." *Hughes v. State,* 3 Tenn.Cr.App. 602, 465 S.W.2d 892, 896 (1970). Here there was none.

Under any standard of review, this defendant has stood trial and the State's proof is insufficient.

The full implications of the recent decision of the Supreme Court of the United States in *Jackson v. Virginia,* —— U.S. ——, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must await further development and refinement. In the meantime, it is clear that the teaching of *In re Winship, supra,* that "[t]he constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt," *Jackson v. Virginia, supra* at 2784, has taken on new vitality and added significance. It requires that we take a fresh look at our present standard of review.[1]

The crux of the Court's holding with respect to appellate review is as follows:

After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." (Citation omitted) Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (citation omitted). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as a weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. *Jackson v. Virginia,* 99 S.Ct. at 2789–90

This does not, in my view, require an abandonment of our established standard of review; but it does demand a meaningful and critical analysis of the record on appeal to insure that the evidence supports a conviction beyond a reasonable doubt. Any lesser standard would not protect against a violation of the Due Process Clause of the Fourteenth Amendment which, under *Winship* and *Jackson,* invalidates any conviction not based on evidence of guilt beyond a reasonable doubt.

We can, and must, on appellate review, consider "all of the evidence" in a light

1. I reserve for another day a consideration of Rule 13(e), Tenn.R.App.P. and the evident

change it makes in our standard of appellate review.

most favorable to the State; we cannot, and must not, accord the convicting evidence any presumption. Such would trespass upon the right of appellate review and would strip it of vitality and validity.

Pragmatic considerations demand this approach. *Jackson v. Virginia, supra,* was directly concerned with the correct standard to be used by federal courts in reviewing state court convictions. After noting that "[a] challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim," the Court held that when the conviction is not based on sufficient evidence, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 2791–92.

As pointed out in the concurring opinion, "the Court's broader standard may well require that the entire transcript of the state trial be read . . . ." *Id.* at 2799 (Stevens, J., concurring).

As a practical proposition our standard of review must harmonize with the federal standard in habeas corpus cases, lest the result be to "undermine the morale and the esteem of the State Judiciary" by having the decisions of this Court vacated by a single federal trial judge.

In the instant case, we solicit this precise result. It requires little prescience to predict that competent counsel for Sam Delk will seek the remedy of federal habeas corpus in this case wherein his conviction has no evidentiary support.

### III.

This entire section and so much of the ensuing section as relates to the failure of Dan Delk to be produced as a witness were written after the remaining portions were tendered to my colleagues as a dissent. Section VI of the main opinion was prepared as a "response." Because it brings forward new matter, and because of a modification in Section III of the main opinion

relating to the discovery of certain business-related papers and documents belonging to Harry Gipson, it is now necessary that I respond.

The majority finds, without evidentiary support in the record, that "beyond a reasonable doubt . . . the taking occurred at the time of the murder." Perhaps so. In an apparent effort to tie their taking to Sam Delk, the majority suggests that the "jury could have found that the defendant owed Gipson money for cigarettes, groceries, beer or the door that was damaged in the altercation." It could; however, the finding would have been without evidentiary support. The record shows that Sam Delk had paid for the door repairs; there is a vague suggestion that he owed Harry Gipson an undetermined amount of money at an unspecified time. The majority opinion offers no explanation for taking these papers to remove evidence of a small indebtedness, if such there were, and leaving over $1,100.00 in money on the person of Harry Gipson or in the cash register.

The majority opinion, in seeking to place a sinister connotation on the discarded papers, overlooks significant facts.

The State called as its witnesses two passengers in Dan Delk's car.

First, the State called Sheryl Weaver. On direct examination she gave this testimony:

Q. Now did you see Dan Delk doing anything when he went off the road?

A. Yes, he said he was getting a pack of chewing gum.

Q. And that's all?

A. Yes, sir.

On cross-examination she testified that Dan did not stop after the right wheels got off on the right-hand side, that he just pulled back into the road and kept going.

The second witness, Martha Overton, on direct, testified as follows:

Q. Well did you see him doing anything at that time besides driving?

A. No, he was driving, he had a beer can in one hand and he was driving with the other hand.

On cross-examination, the questioning was even more specific:

Q. Did he throw anything out of the car or anything like that?

.A. No, he handed the beer can to Sheryl Weaver and the wind was blowing where he had it taped around the little window and anyway he was pushing up against it, as I remember and I told him to quit it if he couldn't drive to let me drive.

By further testimony she established that it was a cold night and the windows were up in the car.

It was this witness the majority apparently had in mind when it charged that one of these two women passengers was living with Dan Delk. The record shows her to be the wife of a man named Overton. She is identified in the record as Martha Dansby Overton.

The testimony of these two witnesses was conspicuously convincing and unequivocal.

It must be borne in mind that it was the State that called these witnesses to the stand and vouched for their credibility. They stand in this record unimpeached and uncontradicted. The State having certified to their credibility and worthiness of belief cannot now attack their veracity—nor can this Court. It would be grievously unfair to permit a party to have the benefit of his witnesses' testimony if favorable and to reject it if unfavorable. Moreover, there is a fixed presumption of law—as charged in this case—that "every witness has sworn to the truth." Nothing in this record refutes that presumption.

The matter of these papers was of controlling significance in the Court of Criminal Appeals. It may seem, at first blush, that I am being unduly critical of that Court's finding of sufficiency. I do not so intend. But for these papers, it is my judgment that the Court of Criminal Appeals would have reversed this conviction.

On page 2 of its opinion, the Court of Criminal Appeals said:

During the evening, following the death of Harry Gipson, the appellant and his brother, Dan Delk, who lived in Dickenson [actually Dickson] were together at a party at a home in Centerville. During this time they were seen conversing together and at one time *left Centerville and drove to Nashville, along the roadway where papers of the deceased were found, to bring a man from work.* (Emphasis supplied).

With utmost deference, the Court of Criminal Appeals was in plain error in this factual finding. Highway 100 does lead from Centerville to Nashville and it was on this heavily traveled highway that the papers were found. They were found on the north side of the Duck River bridge. The town of Centerville, including the local General Shoe Plant where Sam and Dan went to bring an employee home, lies south of the Duck River. This mistake was natural and understandable, but unfortunate since it accounts for an affirmed conviction.

Elsewhere in its opinion the Court of Criminal Appeals notes that the appellant "traveled that highway that evening." There is simply no record support for this finding.

It is true, as suggested by the majority, that the defendant and the deceased had had some trivial previous difficulty; however, as found by the Court of Criminal Appeals, "this did not appear to be serious." Defendant and a brother, while scuffling in a beer joint owned by the deceased, had broken a door and, as found by the Court of Criminal Appeals, he "paid to fix the door on demand."

It is true that defendant on several occasions sent other people into Harry Gipson's Market to make purchases for him. But it is also true that he went in the market from time to time. As a matter of fact he was in the store at 11:30 a. m. the day of the murder, at 5:15 p. m. on the day of the murder, and again around 6:00 p. m. There is no credible proof of ill will between the deceased and Sam Delk. As a matter of

fact, the proof is that upon hearing of Harry Gipson's murder, Sam Delk was in "a mourning-like stage" or "a grieving state," and went immediately down to the market to see about him.

Without explaining its significance, the majority asserts that there was evidence that the defendant did not arrive at Gipson's Tavern until approximately 6:20 p. m. The record shows that Tom Gray went to the tavern and told those present that Harry Gipson had been shot. When Gray learned of the murder he was at his home nearby; he stayed there about ten or fifteen minutes; he then went to Harry's Market and from there to the tavern where he told the patrons of the murder. Sam Delk had been there fifteen to twenty minutes at the time. From this it would appear that Sam Delk left the market and went immediately to the tavern. This, however, is of no significance.

The majority, in its revised opinion, proceeds upon the assumption that because various people saw no one enter or leave Harry Gipson's Market this fact operates to establish that no one came in behind Delk and, therefore, he was the culprit.

First, the majority says:

Louise Chavers went to her front door, hearing Floyd Stone's horn blow. The well lighted front of Gipson's Market was fully visible to her from that vantage point . . . .

Louise Chavers lives on the same side of the street as Harry Gipson's Market. Her front door is approximately 140 feet from the front door of Gipson's Market. At first blush the majority's assertion of visibility would appear valid. Upon examination however, a person standing in the front door of Louise Chavers' house cannot see the front door of Gipson's Market. Her front door appears to be in the dead center of her house.

Columbia Avenue makes a pronounced curve approximately midway between Louise Chavers' house and Gipson's Market. Both are located on the "inside" of the curve. The front of each structure appears to parallel the long axis of the road. The

result is that a person standing at the front door of Louise Chavers' house cannot see the front door of Gipson's Market—with or without two trucks parked in front of the intervening building where they have been for more than two years. Exhibit pictures 9, 10, 11, 14, 15 and 17 make this clear. There is a utility pole directly across the street from Gipson's Market. A line extended from the front line of Louise Chavers' house runs almost exactly to this pole across the street. *See* Exhibit pictures 10, 11, 13 and 14.

We know that Chavers did not leave the house when she heard the horn blow for she says, "I just walked to the front door and pulled the shades down and looked out." Where did she look? Obviously, to her left front, toward the sound of the horn, and not hard right toward the front of Harry Gipson's store.

Next the majority says that those outside the Walker house, along with Floyd Stone and "Goon" Gilbert in or approaching the parked car, had a clear view of the front door of Gipson's Market. Floyd Stone was parked with the long axis of his car at an angle of more than 90 degrees from a line drawn from the respective front doors. Had he looked over his right shoulder he could have seen. Vorgerine Walker and "Goon" Gilbert could have looked straight ahead some 250 feet and they could have seen.

By parity of reasoning, it may be argued that Sam Delk was not in the store. No one saw him enter; no one saw him leave. The fact that these witnesses did not testify to seeing anyone enter or leave the store is of no probative value.

In Section I of its opinion, the majority states the time interval at "seven minutes and twelve seconds . . . for the killer to accomplish the act and escape before discovery of the body." In the revised opinion, the majority reduces the time to "less than three minutes or perhaps even only two." I have not dealt in time intervals because I regard them, at best, as only approximations. Were I to follow the same

reasoning as the majority, I would comment on the fact that Floyd Stone and "Goon" Gilbert were in the store "at least three to five minutes" after they say they discovered the body and no one saw them enter or leave. Further, they too were present. Very little differentiates their position from that of Sam Delk.

The majority's effort to shore up this case only serves to dramatize its inherent deficiencies.

We are dealing with the liberty of a human being.

## IV.

### Conclusion

My dissent is aimed at the remand. I regard the errors cited as grounds for reversal as being trivial.

I am in disagreement with the rationale of the majority's ruling with respect to the comment of the District Attorney General on the failure of the defendant to call his twin brother, Dan Delk. As I understand the holding of the majority, this comment was improper because there was no direct proof that Dan Delk was available.

I cannot agree that where a lawyer identifies a witness sitting in the courtroom, during the proceedings conducted at a public trial, and without contradiction or dispute as to identity, that availability has not been fully demonstrated. I find nothing improper or unfair on the part of the Assistant Attorney General, in this respect.

It is the general rule in this jurisdiction that while the State may not comment on the failure of the defendant to take the stand, this prohibition does not extend to comment on his failure to offer other witnesses in explanation and rebuttal of incriminating facts and circumstances. *Hays v. State,* 159 Tenn. 388, 19 S.W.2d 313 (1929). *See also, McCracken v. State,* 489 S.W.2d 48 (Tenn.Cr.App.1972).

Normally, the failure of a party to produce an available witness who is in a position to know the facts, and who is apparently favorable to him, gives rise to presumption or inference, permissive and rebuttable in nature, that the testimony of such witness would not sustain the contention of such party. *Wooten v. State,* 203 Tenn. 473, 314 S.W.2d 1 (1958); *National Life & Accident Ins. Co. v. Eddings,* 188 Tenn. 512, 221 S.W.2d 695 (1949); *Kidd v. Tennessee Gas Co.,* 33 Tenn.App. 302, 231 S.W.2d 793 (1950); *Craig v. Marquette Cement Mfg. Co.,* 190 Tenn. 234, 229 S.W.2d 148 (1950); *Waller v. Skeleton,* 31 Tenn.App. 103, 212 S.W.2d 690 (1948).

But this presumption or inference does not apply where the plaintiff fails to make out a case, for in such a case *it is not incumbent upon the defendant to introduce any evidence. St. Louis, etc. R. Co. v. Finley,* 122 Tenn. 127, 118 S.W. 692 (1909).

In 29 Am.Jur.2d, Evidence, Sec. 180 (1967), the exception to the rule is stated thusly:

> The rule applicable to a party who fails to call witnesses exclusively in his control does not apply to a defendant who introduces no evidence at all. A defendant, if so advised, may well let the case go to the jury on weakness of the evidence presented by a plaintiff, who had the burden of proof, without being taken to task for failure to call certain witnesses, or have an adverse inference drawn which would not follow from an entire failure to refute the evidence introduced.

Thus, it was not the matter of availability that makes the remarks by the Assistant Attorney General objectionable; but the entitlement of the defendant, as a matter of law, to take the position that the State had not made out a case and decline to offer proof.

Therefore, I reach the same conclusion as the majority, but by different reasoning process. I view the comment as being erroneous, but harmless. I cannot bring myself to believe that it came as any startling revelation to the jury that Dan Delk, the defendant's twin brother who was "here all week," was, in fact, present in the courtroom at that time.

On June 14, 1978, the Supreme Court decided *Greene v. Massey,* 437 U.S. 19, 98

S.Ct. 2151, 57 L.Ed.2d 15, and *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1. These cases stand for the proposition that when a criminal conviction is reversed for evidentiary insufficiency, the double jeopardy clause precludes a second trial. *See Overturf v. State,* 571 S.W.2d 837 (Tenn.1978).

It has been widely suggested that appellate courts would frustrate the import of these cases by the simple expedient of finding some ground of reversal not involving evidentiary sufficiency. I cannot bring myself to believe that appellate courts in general, or my colleagues in particular, would follow such a practice. However, irrespective of purity of motive, this case can only lend credence to this unfortunate line of thinking. This is regrettable.

The State is not entitled to two bites at the apple. Every trial lawyer knows that there are some cases that simply cannot be won because the proof is not there. This is such a case.

In reading the record of trial I am impressed that the young Assistant Attorney General who conducted the entire prosecution did so with conspicuous ability. His presentation of his case, and more particularly his marshalling of the proof, were superb. He milked the case dry. It is a tribute to his painstaking prosecution that he obtained a conviction in spite of a deficiency of evidence. His "lawyering," however, does not alter the failure of the State to make out a case.

I would reverse and dismiss.

OPINION ON PETITION TO REHEAR

FONES, Justice.

The petition to rehear is denied.