# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. HAROLD D. ROBERTS

**Direct Appeal from the Circuit Court for Marion County**
**No. 5013    Thomas W. Graham, Judge**

---

**No. M2001-02291-CCA-R3-CD - Filed September 10, 2002**

---

The defendant was convicted of driving under the influence, third offense; driving on a revoked license; felonious evading arrest; and violating the open container law. The trial court granted a motion for judgment of acquittal as to the felonious evading arrest conviction and imposed the following sentences: eleven months, twenty-nine days, suspended after serving ten months in continuous confinement, for DUI, third offense; four months in the county jail, plus six months' probation, for driving on a revoked license; and thirty days for violating the open container law, with all sentences to be served concurrently. The defendant appealed, arguing that the trial court erred by denying his request to give the jury the missing witness instruction and by improperly sentencing him. We affirm the judgments of the trial court but remand for entry of a corrected judgment as to Count 2 reflecting that the defendant was convicted of third offense DUI.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Philip A. Condra, District Public Defender, for the appellant, Harold D. Roberts.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; James Michael Taylor, District Attorney General; and Julia N. Oliver, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

At trial, Officer Scott Hampton of the South Pittsburg Police Department testified that on October 2, 1999, he was working the 6:00 p.m. to 6:00 a.m. shift. He received a dispatch between 7:00 and 8:00 p.m. to look for a brown Ford Fairmont with an Alabama license plate bearing CY018

as its last five digits, and located this vehicle behind the Amoco Deli at Sixth and Cedar Streets. When he saw the defendant get into the car and leave the deli, Hampton followed the vehicle in his patrol car. The vehicle turned right onto Sixth Street without the brakes being applied and, then, turned right onto Railroad Avenue. At that time, Officer Hampton tried to stop the vehicle by activating all of his flashing lights but not his siren. When the vehicle, which was weaving back and forth, did not stop, Hampton turned on his siren. The vehicle, driven by the defendant, finally stopped at the intersection of East Eighth Street and Railroad Avenue. Hampton turned off his siren, radioed dispatch to inform them of his location, and walked toward the defendant's car. He again checked the vehicle's license plate to make certain that it contained the dispatched five digits. As Hampton reached the rear fender of the defendant's vehicle, the defendant "sped away."

Hampton got back into his vehicle, turned on the siren, and followed the defendant's vehicle until it turned into a residence on East Eighth Street. Hampton exited his patrol car and ordered the defendant out of his vehicle. Hampton said "[i]t took [the defendant] a second to get the door open," and the defendant "had to hold on to the door and the frame of the car or the roof of the car" to steady himself as he was getting out. Hampton ordered him to get down on the ground, but the defendant walked toward the back door of the house. He said the defendant had "a staggering type of gait. He kept looking over his shoulder every time I would holler at him and tell him to get on the ground. He'd look over his shoulder and continue to walk." Hampton approached the defendant just as Sergeant Tim Allison and another officer arrived on the scene, and they assisted him "in putting [the defendant] on the ground, 'cause he wasn't going to cooperate any other way." He described the defendant's appearance at that point:

> He was kind of red faced. His eyes were kind of blood shot and
> glassy, 'cause we had flashlights and we were looking at him and also
> we had the lights still on in our vehicles. He had a very very bad odor
> of alcohol all about him.

Hampton said the defendant's speech was slurred when he asked why he was being stopped. Hampton did not administer any field sobriety tests because the defendant was uncooperative and was already handcuffed. The officers found, in the defendant' car, a cold, open container of beer that had spilled onto the passenger's side floorboard. Hampton arrested the defendant and took him to the station, where he refused to sign the implied consent form and refused to submit to a breathalyzer test. Hampton checked the defendant's driving record and discovered that his license had been revoked. In Hampton's opinion, the defendant was intoxicated at the time he was arrested.

During cross-examination, Officer Hampton said he and the other officers put the defendant facedown on the ground. However, he denied putting his knee in the defendant's back as he tried to get him on the ground.

Shannon Youvette Smith, a jailer at the Marion County Sheriff's Department on October 2, 1999, testified that she placed the defendant's telephone call for him, since he could not see to dial the numbers after two or three attempts. She described the defendant as having "very slow slurred

speech" and being "unstable" and "unsteady." She said, as had Hampton, that the defendant refused to take a breathalyzer test or sign the implied consent form. Smith acknowledged that she is not certified to give a breathalyzer test. She also said that the breathalyzer machine is not checked to see if it is operative until the arrested person agrees to take the test. She noted that the defendant never said anything about refusing to take the breathalyzer test because he thought the machine was broken. Smith said that, in her opinion, the defendant was intoxicated when he was brought in on October 2, 1999. Following Smith's testimony, the prosecution rested its case in chief.

The defendant, testifying as the only defense witness, said that he had lived at 214 East Eighth Street for almost four years, and had left his home on the evening of October 2, 1999, to buy cigarettes. He drove to the Amoco Deli, bought his cigarettes, and drove back home.

The defendant said it was not unusual to see police cars with their blue lights on going toward the housing project near his home. He first became aware of blue lights behind him the night of his arrest when he was on Railroad Avenue. When he saw the lights, he "just kept moving" because he did not think the officer was trying to pull him over. He said that he wanted to get home and out of the way so that the officer could go on to the projects. He said that after he pulled into his driveway, Officer Hampton put a knee in his back and "slammed" him facedown to the ground beside his car. He heard another officer's voice and then heard the officers say that they found an open container of beer in his car. The defendant said that he did not buy beer at the Amoco Deli that night and never saw the open container that the police were talking about when they arrested him. He was immediately handcuffed and taken to jail:

> [Officer Hampton] took me into the booking room and said he was booking me. The jailer, at the time, told me that the [breathalyzer] machine was broke [sic], it would not work and they went on to proceed to tell me sign something [sic] about admitting that I was DUI or drinking and I wouldn't sign it.

The defendant explained that he needed help using the phone at the jail because he was hurt and his "blood pressure might have been up so bad that [he] couldn't even see the numbers." In addition, he said that he had drunk a glass of wine with his lunch between 11:00 and 11:30 a.m. that day, which explained why Officer Hampton thought he smelled like alcohol. He said he had nothing else to drink that day and could not explain the open container that the police found in his car the night of his arrest. He said that he came to a complete stop at the stop sign at Eighth Street, put his turn signal on, turned left across the railroad tracks, and pulled into his driveway. He said that the first time he saw the blue lights of the patrol car, he had no idea that he was supposed to stop. He acknowledged that he did not have a valid driver's license at the time he was arrested.

During cross-examination, the defendant said the car he was driving that night had been given to him a few days earlier by a man he had met a couple of times but whose name he could not remember. He testified that he did not notice that the police car, with its lights and siren activated, did not actually pass him en route to another location. He also said that he did not see Officer

Hampton get out of the patrol car and walk toward him when he stopped at the stop sign at Eighth Street. The defendant said he did not recognize the implied consent form or remember Officer Hampton reading it to him at the jail. When asked whether Hampton offered him a breathalyzer test, the defendant stated, "Officer Hampton did not offer me a breathalyzer test on the machine, because the jailer had already told him the machine was tore up [sic]." He testified, further, that Hampton never offered him a blood test to determine his blood-alcohol content. Following this testimony, the defense rested.

The State recalled Officer Scott Hampton, who testified that he and Shannon Smith never discussed whether the breathalyzer machine was operative on the night of October 2, 1999. He said he asked the defendant if he would allow his blood to be drawn and tested for its alcohol content, but the defendant refused. Hampton then asked the defendant to submit to a breathalyzer test, and the defendant again refused. He denied telling the defendant that if he signed the implied consent form, he would be admitting to driving under the influence. Instead, he read the form verbatim, which was his usual practice when making a DUI arrest.

## ANALYSIS

### I. Missing Witness Charge

On appeal, the defendant argues that the trial court erred by not giving a "missing witness" instruction as a result of the State's not calling Sergeant Tim Allison to testify during the trial. He asserts that:

> [T]he predicate for this missing witness instruction clearly was established. Tim Allison was a police officer with the City of South Pittsburg. So, too, was Scott Hampton, the primary arresting officer. Officer Allison gave substantial assistance to his fellow officer in the take down and arrest of the Defendant. He had ample opportunity to observe the Defendant up close and personal. He was in a position to see, feel, smell and hear the Defendant and, therefore, would have possessed knowledge of the most material fact in this case – the Defendant's state of sobriety or lack thereof.

Although counsel apparently made a "standard request" as to instructions at the conclusion of the proof and just before the trial court began its instructions, the "missing witness" instruction was not requested by the defense until the trial court had concluded its instructions to the jury. The court denied the request, saying, "[A]s long as both sides know the existence [of the witness] and have the ability to get them, . . . you really can't make that charge."

Defense counsel brought up the issue of the missing witness charge a second time during the defendant's sentencing hearing when he requested time to file his motion for a new trial:

[DEFENSE COUNSEL]: Your Honor, may I request of the Court my opportunity to file. . . . I requested the Court charge in this case missing witness, and the Court may recall the conversation we had at the bench when the Court overruled that.

THE COURT: I believe that was one where everybody really knew of the witness, so it was hard to make that argument.

[DEFENSE COUNSEL]: Well, you know, I'll bring this up in my motion for new trial, but I actually have some case law on that and what the rule is, and as a matter of fact, Mr. Paine's comments about the extension of the rule to include a part that's not part of the rule, and I would ask the Court, because I think there was that issue and maybe a couple of others that I would like to bring back to the Court's attention in my motion for new trial, I think they may have had an impact on this. At least, I'm going to try to convince the Court they did, and I'd like to have my time to file my motion and have that heard before [the defendant] is required to report.

The law regarding the giving of the "missing witness" instruction was explained by our supreme court in State v. Francis, 669 S.W.2d 85 (Tenn. 1984):

[T]his Court has held that a party may comment about an absent witness when the evidence shows that "[1] the witness had knowledge of material facts, [2] that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and [3] that the missing witness was available to the process of the Court for trial." Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979). . . . The mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him. However, when it can be said "with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony," an inference may be drawn by the jury that the testimony would have been unfavorable. Burgess v. United States, 440 F.2d 226, 237 (D.C. Cir. 1970).

Id. at 88-89 (footnote omitted).

As the defendant argues on appeal, part of the trial court's rationale for not giving this instruction, that Sergeant Allison was available to both sides, has been criticized by Neil P. Cohen et al., Tennessee Law of Evidence, § 4.01[14][b] (4th ed. 2000), asserting that "this exception, when taken to its logical conclusion, would virtually eliminate the missing witness inference since, in most

cases where the inference is permissible, the party requesting it could have secured the attendance of the witness by the use of process." Even if we accept the defendant's argument that the trial court could not decline to give the "missing witness" instruction because the witness was known to and available to both sides, there clearly were other reasons why this instruction was not justified. The burden of proof was on the defendant, the party seeking the instruction, to establish that Sergeant Allison was, in fact, a "missing witness." See State v. Hodge, 989 S.W.2d 717, 723 (Tenn. Crim. App. 1998). As explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 4.01[14][e], the party seeking the instruction must establish a foundation for doing so. The testimony of Officer Hampton established only that Sergeant Allison was employed by the South Pittsburg Police Department at the time of the defendant's arrest some two years before the trial. However, there was no proof that he was so employed at the time of the trial or even that he was still living. Since the request for the missing witness instruction was not made until after both sides had rested, made their final arguments, and the trial court had instructed the jury, no hearing could be held so that the court could ascertain whether the requested instruction was justified. Had the missing witness instruction been given under those circumstances, it would have unjustifiably highlighted Sergeant Allison's role in the matter. Likewise, there is no proof in the record that Sergeant Allison naturally would have favored the State or that he was not presented as a witness because the State was apprehensive that his testimony would be unfavorable to it. See State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992) (missing witness instruction unnecessary when police officer who wrote the report did not testify since "[t]he officers who did testify provided overwhelming evidence against the defendant, and there [was] no indication that the [missing] officer's testimony would have set forth anything different").

Accordingly, we conclude that this assignment is without merit.

## II. Ten Months' Continuous Confinement

The defendant also argues that the trial court erred in sentencing him to ten months of confinement for his DUI, third offense.

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302. This court's review of a misdemeanor sentence is *de novo* with a presumption of correctness. State v. Troutman, 979 S.W.2d 271 (Tenn. 1998). Although the Sentencing Reform Act typically treats misdemeanants and felons the same, misdemeanants are not given the presumption of a minimum sentence. See State v. Seaton, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). Our supreme court outlined the procedures for misdemeanor sentencing in Troutman, 979 S.W.2d at 273-74:

> The sentencing considerations generally used in determining the manner of service for both misdemeanors and felony sentences are codified at Tenn. Code Ann. §§ 40-35-102, -103. See Tenn. Code Ann. § 40-35-102 (noting considerations used in determining whether confinement shall be imposed); Tenn. Code Ann. § 40-35-103 (setting forth considerations to be used when issuing sentencing of

confinement). In addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement. Compare Tenn. Code Ann. § 40-35-302 ("to consider the purpose of this chapter, the principles of sentencing, and the enhancement and mitigating factors set forth herein") with Tenn. Code Ann. § 40-35-210(f) (stating court shall place on record either orally or in writing what enhancement or mitigating factors it found).

Although a separate sentencing hearing is not required in misdemeanor sentencing, the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a) (1997). A misdemeanor sentence, unlike a felony sentence, has no sentence range. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). Since trial judges are able to assess the credibility of a defendant firsthand, they must be given considerable discretion in determining the proper sentence for a misdemeanor offense.

A trial court has great flexibility in fashioning a misdemeanor sentence. A trial court may place a defendant on probation after a term of continuous confinement, after a term of periodic confinement, or immediately after sentencing. Tenn. Code Ann. § 40-35-302(e) (1997). Tennessee Code Annotated section 40-35-103(1) governs whether a trial court should impose a sentence of confinement:

> Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently have been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (1997).

When a trial court imposes a sentence, it must set a percentage of the sentence to be served by the defendant; once the defendant serves this percentage, then he or she is eligible for rehabilitative programs. Tenn. Code Ann. § 40-35-302(d) (1997). In setting the percentage of the

sentence to be served in confinement, the trial court considers the sentencing principles and purposes of the Sentencing Reform Act of 1989 as well as the relevant enhancement and mitigating factors. Id. The mandatory sentence for a DUI, third offense, is eleven months and twenty-nine days. Troutman, 979 S.W.2d at 273. A trial court can require a defendant to serve 100% of his sentence in a DUI case. State v. Palmer, 902 S.W.2d 391, 393-94 (Tenn. 1995).

Here, the trial court sentenced the defendant to eleven months, twenty-nine days, with ten months to be served in continuous confinement, for his DUI, third offense, applying the following enhancement factors and no mitigating factors:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; [and]
>
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community.

Tenn. Code Ann. § 40-35-114(1), (8) (1997).

According to the presentence report, the defendant's prior record included the following convictions:

| | |
|---|---|
| 3/23/99 | DUI |
| 10/20/98 | Public Intoxication |
| 7/22/97 | DUI |
| 7/22/97 | Reckless Endangerment (No Weapon Involved) |
| 7/01/96 | Public Intoxication |
| 11/9/95 | DUI[1] |

The presentence report also included details of the two times the defendant violated previous probations:

> On 7/22/97 the defendant was placed on probation after receiving two consecutive 11/29 sentences for DUI and reckless endangerment in the Marion County General Sessions Court Cases 26807 and 26809. While on probation, the defendant was arrested and charged with DUI, driving on a revoked license, and violation of [the] registration law. A violation of probation warrant was issued for the defendant's

---

[1] The defendant's first DUI conviction was in Meigs County, unlike the others which were all in Marion County, and was not included in the listing of the defendant's prior DUI convictions in the indictment. Accordingly, the conviction upon which this appeal is based actually is the defendant's fourth DUI conviction.

arrest. On 3/23/99 the defendant's probation was revoked for 120 days and he was returned to probation.

On 3/6/99 the defendant received an 11/29 sentence suspended after serving 120 days upon a conviction for DUI in the Marion County Circuit Court Case 33176. While the defendant was on this suspended sentence, the defendant committed the instant offense on 10/2/99.

In his brief, the defendant argues generally that the trial court improperly sentenced him to ten months of continuous confinement by failing to follow the requirements of Tennessee Code Annotated sections 40-35-102, -103, and -302. However, our review makes it clear that the trial court considered the relevant factors and information before sentencing the defendant to ten months of confinement at 100%. Given the defendant's lengthy record of alcohol offenses, his failure to comply with probation on two different occasions, and the fact that he had been convicted of DUI only six months prior to this offense, we cannot conclude that the trial court's decision to sentence him to ten months for DUI, third offense, was improper.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court but remand for entry of a corrected judgment in Count 2 to reflect that the defendant was convicted of DUI, third offense. The judgment should conform with the uniform judgment document required by Tennessee Supreme Court Rule 17 and Tennessee Code Annotated section 40-35-209(e) and (f).

_____
ALAN E. GLENN, JUDGE