IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2007

## STATE OF TENNESSEE v. WILLIAM PHILLIP GRAHAM

**Appeal from the Circuit Court for Madison County**
**No. 03-154     Donald H. Allen, Judge**

---

**No. W2006-00173-CCA-R3-CD   -   Filed August 22, 2007**

---

The defendant, William Phillip Graham, was convicted of aggravated rape, a Class A felony, at a jury trial in the Madison County Circuit Court. He is presently serving a twenty-year sentence as a Violent Offender in the Department of Correction. In this appeal, he argues 1) that the evidence is insufficient to support his conviction; 2) that the trial court erred in denying his petition to compel attendance of an out-of-state witness; 3) that the trial court made erroneous rulings during the trial relative to the scope of redirect examination of a state's witness; 4) that the court erred in denying his request to make an offer of proof after an adverse evidentiary ruling; 5) that the court erred in allowing the state to recall the victim during its case-in-chief; and 6) that the trial court erred in denying the defendant's requests for curative instructions relative to two aspects of the prosecutor's closing argument. We conclude that no reversible error occurred, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

George Morton Googe, District Public Defender, and Joseph T. Howell, Assistant Public Defender, for the appellant, William Phillip Graham.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun Alan Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was eighteen years old at the time he committed his crime against a then-fourteen-year-old victim. He was charged with aggravated rape and statutory rape.

The victim testified that she was at Arlene Layne's house on the evening of June 4, 2002, because she was going to babysit Ms. Layne's children when Ms. Layne went to work early the following morning. She said that she arrived about 6:00 p.m. and that after about an hour the defendant, who lived across the street, asked her to come to his house to drink alcohol with him. She said she and Ms. Layne's thirteen-year-old son, T.L., accompanied the defendant to his house. The victim testified Ms. Layne said that she was going to go to sleep and that she would leave the door open for them.

The victim said the defendant gave her mixed drinks containing Bacardi. She said she did not know how many drinks he gave her, but it was "[p]robably about two or three." She said the defendant and T.L. were drinking as well. She said that before she started drinking, she cut her foot on a broken shot glass and that the defendant gave her a rag because her foot was bleeding. The victim said the defendant's sister, Amanda, came to the house for about thirty minutes or an hour. The victim said Amanda called the defendant's and her mother and reported that the others were drinking.

The victim testified that she stopped drinking and had become tired and that she attempted to leave the defendant's home. She said that she reached for the door but that the defendant grabbed her, threw her across the living room floor, and told her she was not leaving. She said the defendant forced her into his mother's bedroom and confined her by closing the door. She said the defendant went back to the living room, where T.L. was using a computer. The victim said that she tried unsuccessfully to get out of the room through the window but that the defendant returned to the room, pulled her from the window, and put her on the bed. She said he told her to take off her clothes and then forcibly removed them as the two fought. The victim said that the defendant left the room briefly after telling her to remove her clothes, but she did not specify in her testimony exactly when this took place in relation to the struggle. The victim said she screamed and fought the defendant, who hit her on her face and body with his fist and told her to "shut up." She said the defendant penetrated her vagina with his penis without her consent. She said that she told him "no" but that "[h]e told me he was going to get it either way." She said that the penetration lasted fifteen to twenty minutes and that after it was over, the defendant told her to get dressed and that he was going to take her and kill her. She said the defendant left the room.

The victim testified she got dressed, went into the living room, and asked T.L. how he could let the defendant do this to her. She said the defendant pulled her by her hair to his car and took her to her house. She said she went to the front door of her house, beat on it, and screamed until her aunt let her inside. She reported the crime to the police and submitted to a medical examination that night.

The victim described her injuries from the attack as including a black eye, a broken blood vessel in her eye, a bloody nose, a "busted" lip, bruises, and bleeding from a bite mark on her breast. The victim said that all of her injuries had healed except that she had a scar on her breast.

-2-

On questioning by the defense, the victim denied that she said, "Let's get drunk," to the defendant. She admitted she had consumed alcohol once or twice before that evening, but she claimed she was "not a drinker." She later admitted that she had consumed alcohol "about four times" before that evening. She said she was "buzzed" but not drunk on the night of the crime. She said she did not remember telling a nurse to whom she talked after the attack that the defendant had forced her to drink alcohol. The victim was uncertain but thought she left the defendant's house briefly and returned voluntarily while the defendant's sister was at the house. She acknowledged she told a police officer that she had attempted to leave the defendant's house at about 7:30 p.m. but that he had prevented her from doing so. She said, however, that she had been mistaken about the time and that this had taken place at 11:00 or 11:30 p.m. She revised her earlier testimony regarding penetration taking place for fifteen to twenty minutes and said that it might have occurred for as long as thirty minutes. She acknowledged that she initially told a police officer that the defendant did not penetrate her, but she claimed that she thought the word "penetrate" referred to ejaculation at the time. The victim said she did not recall whether she had ever told the police officers about the defendant dragging her to the car by her hair, but she insisted that it happened. She admitted in her testimony that she told a police officer that she had told the defendant she would not tell anyone about what happened if he would take her home. She also admitted that T.L.'s brother came to the defendant's house after she had begun drinking and asked if she wanted to go back to the Layne residence and that the victim told him she did not. She admitted that she had, at one point, delayed leaving the defendant's house because the defendant told her that the police were outside and that she would be arrested for being drunk. When questioned about a prior statement, the victim revised her testimony about being dragged into the bedroom by her hair and said she had been thrown down by her hair and dragged by her arms. She said she had been able to open the bedroom window and get her foot out of it when she attempted to escape before the rape.

Annie Freels testified that the victim, her granddaughter, lived with her at the time of the crime. She said that the victim was to babysit for a woman named Arlene who was starting a new job at 6:00 a.m. on June 5 and that the victim was to spend the night at Arlene's house on the evening of June 4 in order that the victim would not have to get up at 5:00 the following morning. She said the victim came home sometime around midnight and was banging on the door and yelling. She said the victim was injured and said the defendant had raped her. She said the victim's hair was disarrayed and the victim was shaking. The witness said that she called 9-1-1 and that the police and an ambulance arrived quickly. She said that the victim had a scar on her breast and that the victim's emotional state had not healed.

Officer Clay Haddix of the Jackson Police Department testified that he was dispatched to a rape call at the victim's home at 1:15 a.m. on June 5. He said the victim was in the living room crying when he arrived. He said she had a knot on the left side of her head, a "busted" lip, bloodshot eyes, a bite mark on her right breast, and a bruise. He testified that the victim said she had been raped but that she did not know whether penetration occurred. He said he did not explain to her the meaning of the word "penetration." He said the victim told him that she had arrived at the defendant's house about 7:00 p.m., that she had attempted to leave around 7:30 p.m., and that the defendant had locked the door and had begun giving her liquor. He said the victim said she had

-3-

consumed seven drinks that were provided by the defendant. He said the victim did not mention the use of a weapon during the crime. He said she told him that the defendant had physically assaulted her to the extent that she had lost consciousness at one point. He said she recounted that she attempted to raise the window at the defendant's house but was unable to do so.

Officer Chris Chestnut of the Jackson Police Department testified that he responded to the victim's home. He identified photographs he took of the victim's injuries. He said that the victim was able to identify her attacker and that he and Officers Longmire and Beaver went to the defendant's home, which was a few hundred yards away. He said that when the defendant came to the door, he had blood on the crotch area of his clothing. He said he could see a washcloth with what looked like blood on it on a recliner inside the defendant's house. He said that the officers photographed the scene and the defendant and that they collected evidence. He said they found a broken necklace which the victim told them was broken during the struggle. He identified the photographs, including those of the bedding from the master bedroom at the defendant's house, which he said appeared to have blood on it. He also identified photographs of the victim taken at the emergency room, in which her injuries were visible.

Officer Shane Beaver of the Jackson Police Department testified he was working as a patrol officer in the early morning hours of June 5. He said he responded to the victim's house and later to the defendant's house. He said that when he and other officers went to the defendant's house, the defendant came to the door in response to their knocking. He said the defendant allowed them to come inside the house. He said there was a male in addition to the defendant present and that the officers learned the other man's brother had been at the house earlier, as well. He said he saw a washcloth with what appeared to be blood on it in a chair. He said he assisted in collecting physical evidence. He said the defendant spoke with the officers willingly and related his version of earlier events.

Doctor Michael Nelson testified that he was a board certified internal medicine physician and that he examined the victim at the emergency room in the early morning hours of June 5, 2002. He said the victim reported that she had been vaginally penetrated. He said that he asked her about penetration in layman's terms and that he believed she understood. He collected rape kit evidence from the victim. He said the victim had a black eye, a hematoma in one of her eyelids, bleeding in the white part of her eye, bruising on her face, a laceration on the inside of her lip, a scratch on her neck, a carpet burn on her shoulder, bruises and a scratch on her lower back, scrapes and bruises on her knee, bruising on her breasts, and an apparent human bite mark on one breast. He said he performed a pelvic examination and did not observe any bruising or inflammation. He said that the victim was having her menstrual period and that she had a tampon "pushed all the way up in the vagina to around the cervix," which he said was an unusual location for a tampon and could have resulted from penile/vaginal penetration. He said that the victim's blood alcohol content at 4:30 a.m. on June 5 was .09 or 91 and that the legal limit at that time was .1 or 100.

Investigator Jeff Austin of the Jackson Police Department testified that he responded to the hospital on the morning of June 5. He said he collected physical evidence, including the victim's

clothing and the rape kit. He testified that he later transported several items to the Tennessee Bureau of Investigation for testing. He said that at the emergency room, he spoke only briefly with the victim but that he took a statement from her and photographed her on June 6. He said he photographed the defendant on June 5. He identified photographs that he took of the victim and the defendant. He said the defendant was cooperative and agreed to give a blood sample. He said he learned that the defendant was eighteen years old.

Investigator Austin said he interviewed the victim. He said she did not mention that she was not free to leave the defendant's home on June 4 at 7:30 p.m., nor did she mention having gone across the street to a neighbor's house while at the defendant's home. He said she did not mention having cut her foot on a shot glass. He said she reported having had two alcoholic drinks at the defendant's house. He said she did not mention having been dragged by her hair to the car. He said she told him that she had tried to get out of the bedroom but that the defendant held the door closed. She said that she had attempted to leave through a bedroom window and got her foot out but that the defendant threw her back into the room. He said the victim reported that T.L. had been in the house at the time of the rape. Investigator Austin testified that he interviewed T.L., who was a minor.

Chad Johnson testified that he was a forensic scientist with the Tennessee Bureau of Investigation. He testified as an expert in serology and DNA analysis. He said that he examined the items submitted to the TBI lab. He tested several items and did not find semen present. The items included the bed sheets, the victim's shorts, the victim's t-shirt, the victim's tampon, and the vaginal and anal swabs from the rape kit. He found blood on the defendant's boxer shorts which matched the victim's DNA profile.

Investigator Mike Turner of the Jackson Police Department testified about his duties as evidence custodian. He identified items of bedding, a washcloth, and a broken necklace.

Over defense objection, the state recalled the victim during its case-in-chief. She testified that she was wearing a necklace on the night of the crime and that she lost it in the defendant's home. She identified the broken necklace that was recovered from the defendant's house as the one she had worn that night. The victim said that she was having her menstrual period on the night of the crime and that she was wearing a properly inserted tampon.

The defendant called Arlene Ward, who testified that her last name used to be Layne and that she lived across the street from the defendant in June 2002. She said the defendant and the victim were standing in her yard about 7:30 or 8:00 on June 4, 2002. She heard the victim say to the defendant, "Let's go drink. Let's go get drunk." Ms. Ward testified that T.L. was her son and that he had been at the defendant's house on the night in question. She said T.L. had since moved to Oregon.

Amanda Belyea, the defendant's sister, testified that she had never known her brother to be aggressive or violent. She first said she was living in the same house with the defendant on June 4, 2002, but she later testified that she had lived in the house in the past but lived elsewhere on the date

in question. She said she had gone to the house around 9:30 or 10:00. She said the defendant, the victim, and two children from next door were present. She identified T.L. as one of the children. She said that the defendant, who was eighteen years old, and the victim were drinking alcohol and that the victim was exhibiting signs of having had too much to drink. She said the victim was loud, did not want to sit down, was tripping over things, and was bumping into walls. She said she left around 10:30 and returned, at which point she saw the victim on the couch and was told the victim had cut her foot on a shot glass. Ms. Belyea said that she spoke with her mother by telephone and informed her that the defendant and the victim were drinking and that her mother was displeased. The witness testified that the victim left the house, went to a neighbor's house, and returned. She said the victim left a second time around 11:30, went to a neighbor's house, and did not return. However, the witness said she also left after waiting a little while to make sure that the victim did not return. The witness testified that the windows in the master bedroom were painted and nailed shut. She said she did not observe the victim being held in the house against her will.

The defendant called his mother, Sylvia Belyea. She testified that the defendant was living with her on June 4, 2002, and that she had never known him to be violent or aggressive. She said that on the date in question, she was not home but that she had called around 10:00 to check on the defendant and had spoken with her daughter. She said she learned from her daughter that one of the neighbors was at the house and that they were drinking. She said that she was about an hour away and that she initially planned to drive home but that her daughter convinced her that she had everything under control. She said she told her daughter to make everyone leave and to tell the defendant to go to bed. She said that the windows in her bedroom were nailed and painted shut and that a hammer would be required to open them.

Deborah Thorsen testified that she knew the defendant and the victim. She said that in the four to five years she had known the victim, she had formed the opinion that the victim did not have a good reputation for truthfulness.

Christopher Hensen testified that he did not know the defendant but had known the victim for about two years. He said he was not related to the victim. He said her character was such that she was "nontruthful."

After the court reversed an earlier evidentiary ruling, the defense recalled Amanda Belyea. She testified that she had seen the victim drink alcohol "a couple of times" before the night in question.

The defense called the victim. She denied that on the day after the crime she had gone to Arlene Layne's house and that she was drinking beer that day. She said she had gone home about 6:00 a.m. on June 5, slept until about 1:00 or 2:00, gave a statement to the police after she woke up, and did not leave her house for about two days. She denied that she had consumed beer after giving the statement.

The defense recalled Sylvia Belyea, who said that on the day after the incident she had observed the victim standing on Arlene Layne's front porch drinking beer with three boys and members of the Layne family. She said this took place in the early afternoon before about 2:00. She said she recognized the beer the victim was drinking as being Budweiser because it was in a red and white can.

The state called Annie Freels in rebuttal. She testified that after she brought the victim home from the hospital on the morning after the crime, she and the victim did not leave their home all day. She said the victim was afraid to leave the house. She said Investigator Austin took a statement from the victim at their house.

After receiving the proof, the jury found the defendant guilty of aggravated rape and statutory rape. The trial court later merged the convictions and sentenced the defendant to twenty years in the Department of Correction. This appeal followed.

**I**

We consider first the defendant's challenge to the sufficiency of the convicting evidence of aggravated rape. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

As pertinent here, "[a]ggravated rape is unlawful sexual penetration, of a victim by the defendant or the defendant by a victim accompanied by . . . the defendant caus[ing] bodily injury to the victim[.]" T.C.A. § 39-13-502(a)(2). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body[.]" Id. § 39-13-501(7). "Bodily injury includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Id. § 39-11-106(a)(2).

The defendant argues that there is insufficient proof of aggravated rape, as opposed to an assault, because there is no physical evidence of a rape. He points to the evidence of the lack of bruising, inflammation, or trauma to the victim's vaginal area and the fact that no semen or sperm was found on the items collected by the police. He concedes that a rational trier of fact might conclude that an assault occurred but not a rape. Accepting the defendant's argument would require us to discount the victim's testimony. Accreditation of witnesses is the province of the jury as the trier of fact, not of the appellate court. See, e.g., State v. Williams, 784 S.W.2d 660, 663 (Tenn. Crim. App. 1989). In the light most favorable to the state, the evidence demonstrates that the

defendant unlawfully penetrated the victim's vagina with his penis and that the victim suffered bodily injury. The evidence is sufficient to sustain an aggravated rape conviction.

**II**

The defendant's next issue is that the trial court erred in denying his petition to compel the attendance of an out-of-state witness, T.L. Before trial, the defense filed a "Motion to Secure Witness Attendance" which requested that the trial court "order State funds for witness fees" for T.L., a minor who lived with his father in California.[1] The motion alleged that T.L. could "testify to the accuser's drunken state, flirtatious behavior, willing nakedness, lack of desire to leave the scene, failure to complain of the crime, and lack of harm[, as well as the] Defendant's lack of desire to engage in a sexual act, efforts to care for the accuser and clothe her, and general demeanor on the night in question." The motion recited that T.L.'s father had agreed to travel to Jackson with T.L. by bus. The relief requested was a grant of funds for "bus fare, hotel reimbursement, and meal reimbursement." The court conducted a hearing and entered an order finding that T.L.'s appearance was "necessary to ensure that the Defendant's Constitutional rights are not violated."

The defense later moved the trial court for a continuance because there was uncertainty whether the funds for T.L. would arrive in time for the scheduled trial date, and the trial court entered an order granting the continuance. Thereafter, the defense filed a "Petition to Secure Attendance of Witness" alleging that T.L. was "a necessary and material witness who will testify favorably for the defendant" and seeking that the trial court issue "a certificate . . . for the purpose of being presented to a judge of a court of record in the State of California in a proceeding to compel the attendance of said [T.L.] as a witness at [the defendant's] trial . . . ." The trial court commented on the record prior to the hearing that it had taken the defense attorney's word as an officer of the court that the witness was material when it granted the travel funds but that it had never been presented with an affidavit from the witness. The following day, the court conducted a hearing at which the defense counsel did not offer an affidavit of T.L.'s anticipated testimony. Defense counsel claimed that T.L.'s father was no longer cooperative and that, thus, the defense was unable to offer an affidavit. The defense explained that the reason for the motion was to obtain an order of the trial court which would set into motion the process in California to hale the witness into a California court and possibly into custody for the purpose of compelling his attendance at the defendant's trial in Tennessee. Counsel submitted a police report which documented a statement T.L. had given. The trial court denied the petition, finding the defendant failed to demonstrate that T.L. was a material witness.

Tennessee has enacted the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings. T.C.A. §§ 40-17-201 to -212. The statute includes provisions for compulsory attendance of out-of-state witnesses at criminal proceedings in Tennessee courts. The witness must be material. Id. § 40-17-203. "A defendant seeking to secure the presence of an out-of-state witness must demonstrate that the witness will offer material testimony." State

---

[1] According to information of record, T.L. later moved to Oregon.

v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992); see T.C.A. § 40-17-207. The decision whether to compel the attendance of a witness is within the discretion of the trial court and is subject to appellate review for abuse of discretion. State v. Workman, 667 S.W.2d 44, 49 (Tenn. 1984).

In the present case, there was no abuse of discretion under the Uniform Law. The defendant did not demonstrate at the hearing that the out-of-state witness would offer material testimony. At most, he demonstrated that the witness had given prior statements to police in which he had reported some facts which were inconsistent with the victim's pre-trial statements, and ultimately, the victim's testimony. Assuming arguendo that the witness would testify in accord with his prior unsworn statements, his statements were not clearly exculpatory to the defense. The witness reported that around midnight, the defendant would not let the victim leave his house. The witness also reported that he observed the defendant physically restraining the victim and that the victim reported to the witness that evening that the defendant had raped her.

The defendant argues on appeal that he suffered various constitutional deprivations, including his right to due process, his right to a fair trial, and his right to compulsory attendance of a material witness. The defendant is correct that the "Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000); see Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). In the context of compulsory attendance of witnesses, the Supreme Court has observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967). The foundation of such claims is that the witness or the evidence the defense seeks to offer is material to the defense. See, e.g., United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446 (1982) (holding that a defendant who attempts to establish a violation of his constitutional right to compulsory process "must at least make a plausible showing of how [the witness's] testimony would have been both material and favorable to his defense"); Bacon v. State, 385 S.W.2d 107, 109-10 (Tenn. 1964) (holding that a defendant is entitled to compulsory process of witnesses upon showing of materiality of witnesses' testimony); State v. Alvin Glenn Hughes, No. 03C01-9208-CR-0018-00183, Shelby County (Tenn. Crim. App., June 9, 1993) (observing that a defendant has a fundamental constitutional right to compulsory process of a witness at trial upon a showing that witness is material, and trial court has no discretion in issuing such process).

In the present case, the trial court found that the defendant did not demonstrate the materiality of the anticipated testimony of the out-of-state witness. In fact, the defense could not even forecast the substance of the witness' testimony other than to presume that the witness would testify consistently with the statement he had given the police at the time of the crime. As discussed above, the evidence was of questionable value in exculpating the defendant, as it also may be fairly viewed as incriminatory. Also, the evidence was not the only means available to the defense to impeach the victim's version of events. Given these facts, we conclude that the trial court did not violate the defendant's constitutional rights in denying the motion to compel T.L.'s attendance at trial.

**III**

The defendant argues that the trial court erred in allowing the state to exceed the scope of cross-examination in its redirect examination of Dr. Michael Nelson. Specifically, the court allowed the state to inquire about the location of the victim's tampon and the possible cause of its location. Doctor Nelson testified on direct examination that he removed the victim's tampon from her vagina near her cervix. The defense did not cross-examine the witness on this subject. On redirect examination, the state was allowed to elicit that the location of the tampon was unusual and that it could have resulted from penile penetration of the victim's vagina.

The "scope of redirect examination . . . is within the discretion of the trial court, whose ruling will not be reversed absent an abuse of that discretion." State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999); see State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Although the Tennessee Rules of Evidence do not address the scope or manner of redirect examination of a witness, "Tennessee law is well-settled that redirect examination can broach topics raised on cross-examination even though those matters were not inquired into on direct examination." State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997). Moreover, a trial court may allow redirect examination of a witness on facts that were not covered on direct or cross-examination. State v. Rafael A. Bush, No. M2002-02390-CCA-R3-CD, Rutherford County (Tenn. Crim. App. Apr. 14, 2004), app. denied (Tenn. Oct. 4, 2004); Neil P. Cohen et al., Tennessee Law of Evidence § 6.11[6][b] (5th ed. 2005).

The defendant has not explained how the ruling was an abuse of the trial court's discretion or how he was prejudiced. The record reflects that the state had elicited testimony about the location of the tampon on direct examination, and this additional inquiry on redirect was relevant and brief. The defendant was allowed on recross-examination to inquire whether there were other explanations besides sexual penetration for the unusual location of the victim's tampon. We are not convinced that the trial court abused its discretion in allowing examination which exceeded the scope of direct and cross-examination.

The defendant also makes a cursory argument for the first time on appeal that the objection should have been sustained because "it sought mere speculation by the witness." "It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or

position in mid-stream, and advocate a different ground or reason in this Court." State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988).

## IV

The defendant claims that the trial court erred in denying him the opportunity to make an offer of proof during Dr. Nelson's testimony. The defense anticipated that the offer of proof would consist of testimony that the victim had traces of marijuana and antidepressants in her system and that she took birth control pills. Before trial, the court ruled that this evidence would be inadmissible. The defense then sought at trial to make an offer of proof of these facts through Dr. Nelson. The trial court did not let the defense make a formal offer of proof by questioning Dr. Nelson on the record. However, it allowed the defense to make a statement on the record of the evidence it sought to elicit from Dr. Nelson. The defense stated that it sought to have Dr. Nelson testify about marijuana in the victim's system, about the victim not having been given emergency birth control at the emergency room because she took birth control pills, and about the victim's use of antidepressants and possible interaction of antidepressants and alcohol. With respect to this last point, the defense attorney said he wanted to inquire whether alcohol had an adverse effect when combined with the antidepressant the victim was taking. Counsel did not state what he expected the doctor's testimony would be. The court reiterated its pretrial ruling that the evidence was irrelevant and prejudicial. The court noted that there was no allegation that anyone had used marijuana on the night of the crime. The court also found that whether the victim took birth control pills was not relevant to the issue of whether she consented to have sex with the defendant. The court questioned whether an emergency room physician was qualified to testify regarding any interaction between antidepressants and alcohol and agreed with the state that a toxicologist, chemist, or pharmacist would likely be the proper witness to provide evidence of this nature.

An important purpose of an offer of proof is to foster appellate review. Alley v. State, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). A party may obtain relief based upon erroneously excluded evidence if "the substance of the evidence and the specific evidentiary basis supporting the admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2); see Alley, 882 S.W.2d at 815 (holding that as a general principle, an appellant must make an offer of proof of excluded evidence he seeks to have admitted unless its substance is otherwise apparent). In this regard, the trial court "shall permit the making of an offer in question and answer form." Tenn. R. Evid. 103(b). Given the mandatory language of the rule, a trial court should exercise its discretion sparingly in denying a party the opportunity to place on the record the evidence in testimonial, as opposed to narrative form. See Neil P Cohen, et al., Tennessee Law of Evidence, § 1.03[5][d] (5th ed. 2005) (noting that narrative of excluded proof is not the best or encouraged method for an offer of proof and that the strongly encouraged method is by presentation of the actual testimony). Only if it is obvious from the record that the proffered evidence could not be relevant in any way to the issues on trial, the trial court may properly deny a party's request to make an offer of proof. Alley, 882 S.W.2d at 816.

First, with respect to the defense's anticipated evidence that the victim had marijuana in her system and took birth control pills, we note that the state does not contest the accuracy of those facts. It is obvious from the record before us that the proffered evidence was not relevant to the trial issues. Thus, the trial court did not err in limiting the means by which the defendant was allowed to make an offer of proof on these evidentiary points. Id.

The question of our ability to review the denial of an offer of proof on the issue of the use of antidepressants and alcohol is more complex. The issue involved questions of expert qualifications and expert opinion testimony which were not obviously irrelevant, and the trial court should have allowed the defendant to make its offer of proof in question and answer form. See Tenn. R. Evid. 103(b). However, to obtain appellate relief, the defendant must demonstrate that he was prejudiced by the trial court's ruling. Tenn. R. App. P. 36(b).

The defendant never placed on the record in any form the substance of what Dr. Nelson's specific testimony would be about the victim's concurrent use of antidepressants and alcohol. During the mid-trial hearing, counsel alluded to a possible interaction, but he never stated that Dr. Nelson would testify that the victim's memory could be affected by the combination of alcohol and the particular antidepressant the victim was taking. At the motion for new trial, the defense complained only of the denial of an offer of proof relative to Dr. Nelson's anticipated testimony that the victim had marijuana in her system. The defense did not specifically complain at that stage about the ruling with respect to alcohol and antidepressants. Further, the defense did not tender an affidavit from Dr. Nelson outlining what his testimony would have been in an offer of proof. Neither did the defense provide any other form of evidence to demonstrate the materiality of the excluded evidence. For example, the defense might have provided an affidavit or treatise stating that the use of antidepressants and alcohol together would have had a synergistic effect on the victim's ability to recall accurately the disputed events, if such was the defense's contention. See generally State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986) (stating that counsel might supplement an inadequate offer of proof made at trial by submitting "an affidavit or other report" in support of the motion for new trial). Ultimately, the defendant, as the party seeking relief from the trial court's action, had the responsibility to "take whatever action was reasonably available to prevent or nullify the harmful effect of an error" as a predicate for relief. Tenn. R. App. P. 36(a). In the present case, that duty necessarily entailed demonstrating the substance and the relevance of the proposed evidence. The defendant has not demonstrated prejudicial error.

**V**

The defendant contends the trial court erred in allowing the state to recall the victim during its case-in-chief. The record reflects that after the victim testified, Investigator Mike Turner testified about the recovery of a broken necklace at the defendant's home. Doctor Nelson also testified after the victim, and his testimony included evidence that the victim was having her menstrual period and that she was wearing a tampon which had been pushed up to her cervix. The trial court allowed the state to recall the victim, who testified that the necklace was hers, that she was having her menstrual period on the night of the crime, and that she had been wearing a properly inserted tampon.

-12-

Whether a party may recall a witness is a matter entrusted to the discretion of the trial court. State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993). We will not disturb the trial court's decision unless an abuse of discretion is shown. Id.

The defendant argues that the recalling of the victim was a continuation of her direct examination testimony, which had been concluded, and not for rebuttal purposes. He has not explained, however, why this amounts to error. We are unpersuaded that the trial court abused its discretion.

## VI

The defendant's final complaints concern the trial court's refusal to give curative instructions in response to the prosecutor's closing argument. The defendant requested, and was denied, curative instructions relative to the state's argument that the forensic evidence showed that the defendant was "down to his boxer shorts" and that the defendant had the opportunity to present the testimony of T.L.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

## A.     Defendant Was "Down to His Boxer Shorts"

The state argued that Agent Johnson testified that he tested the defendant's boxer shorts and determined that the victim's blood was on them. The state continued,

> Ladies and gentlemen, what does that tell you?  At some point, the defendant is down to his boxer shorts in front of [the victim].  And her blood gets on his boxer shorts.  I submit to you ladies and gentlemen, that's one more piece of evidence that buttresses what [the victim] told you as to how this event occurred because her blood is on his boxer shorts.  Now, there's a struggle going on.  She told you she couldn't remember how much of his clothes he got off, but her clothes were off.

The state may properly argue those conclusions which are reasonably inferred from the evidence of record. State v. Henley, 774 S.W.2d 908, 912 (Tenn. 1989); State v. Sutton, 562 S.W.2d 820, 826 (Tenn. 1978). The argument the state made was that a reasonable inference could be drawn that the defendant was "down to his boxer shorts," rather than an inaccurate characterization of the

direct evidence of record. The argument was proper. The trial court did not abuse its discretion in denying a curative instruction, as there was no error to cure.

## B.     Defendant's Failure to Call Absent Witness

The defendant also complains about the prosecutor's closing argument relative to the absence of T.L. at trial. During the state's initial argument, the prosecutor did not dispute that T.L. had been in the defendant's house during the crime. In pertinent part, the prosecutor stated:

> [The victim] gets in the bedroom, and she's thrown on the bed. Now, [the defendant] stepped out of that bedroom a time or two because, remember, there's another individual that's in that other room working on that computer – another juvenile, young [T.L.] – Mr. [T.L.]. You've heard from his mother, Arlene Layne Ward – Ms. Ward this morning, who testified that young Mr. [T.L.] doesn't live here. [T.L.] is somewhere out in Oregon at this point. So, he's not here. But he's in that other room.

The prosecutor later summarized the evidence at trial and argued that all of the state's witnesses supported the victim's testimony that the rape occurred. In part, the prosecutor argued:

> . . . I just ask you to consider all of this evidence. I ask you to consider every witness that you've heard today. And what you've heard from all the witnesses today, ladies and gentlemen – the events that you've heard occurred because [the victim] told you they did. What the doctor told you supports what [the victim] told you. What the police told you supports what [the victim] told you. <u>Nobody else was there. The witnesses you heard from yesterday and the witnesses you've heard from today were not there when this attack occurred except for [the victim]</u>. And so, when you listen to [the victim] – and you get to assess all credibility of all witnesses. You get to assess that credibility. . . .

(Emphasis added.)

Then, during the defendant's argument, counsel said:

> Now, ladies and gentlemen, I want you to recall from [the victim's] testimony that she and [the defendant] were not the only people there that night – that while this alleged assault was occurring [T. L.] was there. He was there the whole time. And you even heard an officer testify he may have even been there when they went over – back over to [the defendant's] house. Where is [T. L.]? It's the

-14-

State's burden to prove this case. Why isn't [T. L.] here? He could have been brought here. Ladies and gentlemen, [the prosecutor] told you that just earlier in his closing that no one else was there. There was someone else there. [T. L.] was there. However, he's not here. [The victim] testified that [T. L.] could have heard her screaming, but we'll never know because he's not here to tell us.

The state then responded during its rebuttal argument:

Now, [the defense attorney] has told you that, you know, where is [T.L.], this other person that was in the house. I don't know. They called his mother. His mother was up here on the stand. They found his mother. And his mother told you that he's somewhere out in Oregon. I don't know where he is. But they talked to his mother and called his mother to the witness stand and didn't call him. I don't know where he is.

The defendant argues on appeal that the prosecution's arguments improperly shifted the burden of proof and that the defense was denied the right to present an adequate defense. He claims that the state's argument was improper and that the trial court's denial of a curative instruction was error.

First, considering in context the state's initial argument, the prosecutor said that T.L. had not been present at trial. In a later portion of the state's closing argument, the prosecutor argued that none of the witnesses who testified at trial were present at the scene, other than the victim. We believe that, taken in context, the prosecutor's statement that no one else was present meant no other trial witness was present when the crime occurred, as opposed to no other person, including T.L., was present for the crime.

Notwithstanding the innocuous character of the state's initial argument, the defense chose to focus a portion of its argument on whether the state had failed to prove its case by failing to call T.L. as a witness. The defense argument implied that T.L. was not present because he could not corroborate the victim's testimony. The state did not object but chose in its rebuttal argument to point out that the defense had called T.L.'s mother was a witness and that she had testified T.L. was in Oregon. The state implied that the defense could have proffered T.L. as a witness.

Tennessee allows a prosecutor to comment on the defendant's failure to call a witness in certain circumstances. State v. Francis, 669 S.W.2d 85, 88 (Tenn. 1984). The Supreme Court has recognized,"[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would have been unfavorable," Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 41 (1893). The "presumption" of Graves has, in modern times, been characterized as a permissive inference. See, e.g., Francis, 669 S.W.2d at 88.

As a predicate for comment on a missing witness, the evidence must show that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for the trial.

Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979). Tennessee law has established that a party who intends to argue an inference of evidence from a missing witness should obtain a ruling from the court on whether the Delk requirements have been met before employing the argument. State v. Francis, 669 S.W.2d 85, 90 (Tenn. 1984).

In the present case, the state's initial references to T.L. were not made in the context of an attempt to invoke an unfavorable inference to the defendant's detriment relative to T.L.'s absence at trial. On the other hand, the defendant did attempt during its argument to weaken the state's case by highlighting the state's failure to call T.L. The state then responded to the defendant's attempt to invoke the inference by arguing that the defendant had an equal opportunity to present the witness but failed to do so. Given that the defendant "opened the door" to this line of argument, we are unconvinced that the trial court abused its discretion in thereafter denying the defendant's request for a curative instruction when the state responded to the defendant's missing witness argument. See generally State v. Payton, 782 S.W.2d 490, 496 (Tenn. Crim. App. 1989) (holding that trial court is afforded wide latitude in controlling arguments of counsel and its actions will not be reversed absent showing an abuse of discretion).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE