IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2010 Session

## JOY HENLEY McKEE v. JEFFREY ELSTON McKEE

**Appeal from the Chancery Court for Rutherford County**
**No. 06-1965DR      Royce Taylor, Judge**

---

**No. M2009- 01502-COA-R3-CV - Filed August 17, 2010**

---

In a divorce action, Husband appeals the trial court's valuation of Wife's dental practice, its division of the marital assets, and its denial of alimony.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Darrell L. Scarlett, Murfreesboro, Tennessee, for the appellant, Jeffrey Elston McKee.

James L. Weatherly, Jr., Nashville, Tennessee, for the appellee, Joy Henley McKee.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Jeffrey McKee ("Husband") and Joy McKee ("Wife") were married on December 18, 1982.  Wife filed for divorce on December 27, 2006, citing irreconcilable differences and inappropriate marital conduct.

The parties met in Memphis while Wife was completing her graduate program in pediatric dentistry.  They eventually moved to Murfreesboro so that Wife could open her dental practice, which she did in August 1983.  Upon their relocation, Husband worked for Wife's father for three years and then found employment in the banking industry. Wife made significantly more money than Husband.  The parties' tax returns show that Wife averaged a yearly income of approximately $524,280 from 2001 to 2006.  During these same years, Husband's average yearly income was $81,362.  The parties had children in 1987 and 1989, and both parents continued working.  Although Husband contributed much less financially

to the marriage than Wife, he insisted at trial that he made significant contributions as a homemaker and caregiver to the parties' children.

The trial was held on January 7, January 8, and March 9, 2009. On June 15, 2009, the court entered its order granting Wife a divorce on the grounds of Husband's inappropriate marital conduct. The court concluded that Wife "proved by a preponderance of the evidence that [Husband] offered indignities to her throughout the marriage in front of family, friends, business associates and strangers." The court noted that Husband "had a continuing open relationship with another woman since the parties' separation," and while Wife admitted to having a sexual affair of her own seventeen or eighteen years ago, her conduct was "remote and not equal to the fault of the husband."

Much of the focus at trial concerned the valuation of Wife's one-third interest in the dental practice of which she is a partner. The court noted that if Wife's business interest was sold, "the only assets which would be marketable would be the equipment and accounts receivable." With regard to the equipment, the trial court stated in its order, "Since neither party offered proof of the market value of the used dental equipment, the court will use the value of the wife's expert as being closest to the market value." As for the business itself, Wife claimed her practice had a value of $97,220, while Husband insisted its value was $460,000. Husband attempted to put a value on patient files because they had been valued by Wife's accountant in a previous sale to Wife's partners. However, Husband's valuation expert admitted that the patient files had no value without a non-compete agreement. The court sided with Wife and valued the practice at $97,220.

With regard to other marital assets, the court noted that the majority of the household furnishings were antique pieces that Wife purchased with the "thousands of dollars annually" that she received as gifts. The court determined that the antiques should be classified as separate property. The court valued the other household furnishings according to Wife's estimates, concluding that Husband had relied on "an unexplained banking formula." All other assets were valued by agreement. The parties agreed to be bound by the appraisals submitted on the real property, despite the fact that market conditions had changed considerably since the appraisals.

Husband proposed a 50/50 division of assets, and Wife proposed an 80/20 division. The court found Wife's division to be most equitable, noting that an equal division of the property was not equitable under the circumstances. The court pointed out Husband's failure to provide bank records during discovery, any record of expenditures as required by Tenn. Code Ann. § 36-4-106(d)(1)(B), or any accounting for his earnings except for his 401(k). The court noted that Husband moved from the marital residence in 2003 and provided no support for the children's private schooling or other necessities. Wife paid the mortgage on

their Sewanee home where Husband stayed. Husband testified that he paid utilities, but the court noted that Wife had records of payment and Husband had none. The court described Husband's contribution to the family:

> [Husband] turned down the opportunity to stay home with the children when they were firstborn and the burden was on [Wife] to care for the boys with a nanny to assist and build her business. [Husband] provided little assistance except to keep the children a few weekends per year when they were school age when [Wife] had dental meetings and provide transportation to school and sporting events before the children could drive. As noted previously, he left the marital home while the children were teenagers. [Wife] built her business, paid the vast majority of all expenses, provided most of the care for the children and saved her money. [Husband] pursued his career, played, partied and failed to account for his earnings.

As such, the court ordered that Wife receive all assets titled in her name, as well as jointly titled real property. Husband received all assets titled in his name.[1] Additionally, Wife was ordered to transfer to Husband one-half or $399,906.00 from the T-Bank-Investment account or other cash source upon the order becoming final. In total, Husband was to receive assets valued at $750,122.75 (25%), and Wife was to receive assets valued at $2,238,637.00 (75%).

The court also denied Husband's request for alimony. The court noted that because Husband did not suffer the relative economic disadvantage typical of homemakers, an award of alimony was inappropriate. Instead, the court noted that Husband "pursued his career unhindered by any marital obligations" and "did not subordinate his career for the benefit of the marriage."

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999). Issues of statutory construction present questions of

---

[1] The court made no mention of the parties' debts. Three debt items are listed on the statement of assets and liabilities that was attached to the trial court's order. The Sewanee home has a listed value of $975,000 and debt of $603,394. The other two debt items are "business interests" listed as "Joy McKee, DDS, MS, PC" for $406,080 and "McKee, Curry, Stanley Pediatric Realty Partnership" for $494,804.

law. *Lipscomb v. Doe*, 32 S.W.3d 840, 843-44 (Tenn. 2000); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999).

ANALYSIS

On appeal, Husband asserts that the trial court erred in the valuation of Wife's dental practice, in the division of the marital assets, and in denying him alimony.

Valuation of Wife's Dental Practice

Husband asserts that the trial court erred in its valuation of Wife's dental practice. The valuation of a marital asset is a question of fact. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). Each party bears the burden of producing competent evidence regarding the valuation of a marital asset. *Kinard*, 986 S.W.2d at 231; *Wallace v. Wallace*, 733 S.W.2d, 102, 107 (Tenn. Ct. App. 1987). If the evidence of value is conflicting, the trial court has discretion to assign a value that is within the range of values supported by the evidence. *Kinard*, 986 S.W.2d at 231. The trial court's valuation is given great weight on appeal. *Powell v. Powell*, 124 S.W.3d 100, 103 (Tenn. Ct. App. 2003).

Wife started her dental practice as a sole proprietorship in 1983. Wife added Dr. Curry as a partner in her practice in 2000 and added Dr. Stanley in 2005. At the time of trial, Wife owned a one-third interest in McKee, Curry and Stanley Dentistry Partnership. Wife relied on Cain, Watters & Associates, P.L.L.C. in determining the price of the buy-ins during these two transactions. Cain Watters is a consulting and accounting firm, specializing in dental practices, that had worked with Wife's practice for thirteen years at the time of trial. Cain Watters assisted Wife with practice management, as well as planning for retirement and other personal financial issues.

Two experts at trial testified with regard to the valuation of Wife's dental practice; Tom Price testified on behalf of Wife, and Mike Hallum testified on behalf of Husband. Mr. Price valued the practice at $97,220, while Mr. Hallum valued it at $460,000. Both experts valued the practice as of December 31, 2007. Approximately $30,000 of the discrepancy is due to a difference in the valuation of dental equipment. Mr. Hallum acknowledged at trial that he "would certainly be willing to acquiesce to [Mr. Price's higher] number" regarding the equipment. The more significant difference between the two values lies in the valuation of goodwill in the form of patient files. Mr. Price disregarded the patient files for valuation purposes while Mr. Hallum considered them as a factor.

Mr. Price testified about the methodology for valuation of a professional business in a buy/sell setting like the one used in acquiring Drs. Curry and Stanley versus in a divorce.

-4-

In a buy/sell transaction, Mr. Price stated that the value is based on tangible assets like cash, accounts receivable, fixed assets, and prepaid expenses, as well as intangible assets in the form of goodwill. The relevant distinction between goodwill for valuation purposes in a buy/sell is in identifiable goodwill and unidentifiable goodwill. In a valuation for divorce purposes, however, the distinction is between personal goodwill and business goodwill. Under Tennessee law, personal goodwill is not considered a marital asset.[2] *See, e.g.*, *Cunningham v. Cunningham*, No. W1999-02054-COA-R3-CV, 2000 WL 33191364, at *3 (Tenn. Ct. App. Oct. 20, 2000); *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985) ("[P]rofessional good will is not a marital asset which would be accounted for in making an equitable distribution of the marital estate.").

Mr. Price testified that Cain Watters had used the "capitalization of earnings" method to value Wife's dental practice for the purposes of the buy-sell. This method incorporates both tangible and intangible assets. Cain Watters allocated a portion of the intangible value to "patient records." Mr. Price testified that Cain Watters informed him that it did not have a formula for determining the value of patient records in 2005 when Dr. Stanley was added to the practice. Mr. Price testified that in his opinion, no value should be attributed to patient records in the context of a divorce proceeding because it equates to personal/professional goodwill and only business/practice goodwill is admissible in a marital dissolution.

In reaching the conclusion that the patient records were personal goodwill rather than business goodwill, Mr. Price relied on a checklist developed and used by Rod Burkert, a CPA and business valuation expert, in business valuation courses that Mr. Price has attended. According to Mr. Price's valuation report, Mr. Burkert states that professional goodwill is goodwill that is associated primarily with the individual practitioner while practice goodwill is associated primarily with the practice as an institutional entity. Under the rubric of Mr. Burkert's checklist, Mr. Price stated that "the customer components are all factors of personal goodwill." Mr. Price offered the following explanation:

> In the case of a dentistry practice the customers (patients) come to see a person licensed to deliver a personal professional service. . . . [A] relationship with the patient and dentist is based on the good reputation, trust and personal skill of the professional. That relationship is what the buyer hopes to purchase from the seller.

---

[2] Mr. Price and Mr. Hallum, as well as the sources upon which they relied, variously refer to "practice" or "business" goodwill versus "professional" or "personal" goodwill. Both experts agree that it is appropriate to include practice/business goodwill in valuing a business for divorce purposes, but not professional/personal goodwill. For purposes of this opinion, we use the terms interchangeably.

Mr. Price testified that patient records are not capable of earning money "without a professional providing the service." Mr. Price further noted that the presence of a non-compete or other restrictive covenant in a buy-sell is proof of the existence of personal goodwill. That was the case with Wife's practice:

> The restrictive agreement that is part of the current partnership agreement seeks to eliminate the possibility of the retiring or departing partner/shareholder competing in any fashion whatsoever with the remaining dentists further verifying the importance of the doctor and dentist relationship whether it is referred to as patient records and files or goodwill.

While Mr. Price and Mr. Hallum agree that it is inappropriate to consider personal goodwill in valuing a business for divorce purposes, they differ in their categorization of patient files. Mr. Price believes patient files fall under the category of personal goodwill and therefore should not be considered for valuation purposes. Mr. Hallum, on the other hand, believes that patient files are a separate asset from goodwill. Mr. Hallum claimed that his view was consistent with Cain Watters's earlier valuation of the practice for buy/sell purposes in that Cain Watters made separate allocations for personal goodwill and patient files.

Mr. Hallum relied heavily on Cain Watters's 2005 valuation of the dental practice, testifying that without that transaction, "it could have been very difficult for me to say, well, here's my calculation of how much of the intangible value of this business is attaching to the business versus attached to the goodwill." Mr. Hallum testified that he considered the 2005 sale as part of his valuation assessment because valuation literature dictates that transactions occurring within five years of the valuation be considered.

In the 2005 transaction, Dr. Stanley purchased a one-third interest in the practice for $749,000. Of that amount, $333,334, or 45% of the total purchase price, was allocated to the personal goodwill of Wife and Dr. Curry. Approximately 34% of the total purchase price was allocated to patient files and records. Mr. Hallum testified at trial that he had "no idea" how Cain Watters arrived at the value assigned to patient files. He states in his valuation report that the amounts allocated to goodwill in the 2005 transaction "appear reasonable based on the general makeup of the Practice given the number of employees, dentists, reputation of the practice and the fact that some referrals are made to the Practice as opposed to individual dentists." Mr. Hallum did acknowledge that allocations of goodwill between personal and business goodwill are "subject to argument and difficult to define." At trial, Mr. Hallum again reiterated that "[t]here's definitely an art versus a science to valuation theory in this area where you're talking about allocations of goodwill."

Mr. Price, on the other hand, did not consider either the 2000 or 2005 transaction in his valuation. Mr. Price noted that "[b]oth of these sales offer a reasonable basis for valuing the partner and shareholder interest of [Wife] if personal goodwill is to be included in the value," as is the case in determining fair market value *outside* of a divorce proceeding. For the purposes of a marital dissolution, however, the calculation of personal goodwill is not appropriate. He therefore did not consider the two previous buy-ins.

On appeal, there is a presumption that the trial court's valuation, a question of fact, is correct. Tenn. R. App. P. 13(d). Because courts have consistently held that personal goodwill cannot be a component in the valuation of a professional practice in an equitable distribution of a marital estate, Mr. Price's valuation report is reasonable and was properly considered by the trial court. The value that the trial court placed on Wife's dental practice was within the range of the valuation evidence presented by the parties. *See Kinard*, 986 S.W.2d at 231.

Husband also focuses heavily on the fact that Cain Watters did not serve as Wife's valuation expert at trial. Given Cain Watters's national reputation for work with dental practices and its involvement in "every phase" of Wife's practice for thirteen years, Husband claims that its lack of participation in this trial is significant. As a result, Husband insists that the missing witness rule should be applied to Cain Watters.

The missing witness rule provides that the failure of a party to call a witness gives rise to a permissible inference. *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984). "[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would have been unfavorable." *Graves v. United States*, 150 U.S. 118, 121 (1893). There are three prerequisites to application of the rule: (1) the witness had knowledge of material facts; (2) a relationship exists between the witness and the party that would naturally incline the witness to favor the party; (3) the missing witness was available to the process of the court for trial. *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979). These requirements are to be strictly construed. *Francis*, 669 S.W.2d at 89.

> The mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him. However, when it can be said "with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony," an inference may be drawn by the jury that the testimony would have been unfavorable.

*Id.* at 88-89 (quoting *Burgess v. United States*, 440 F.2d 226, 237 (D.C. Cir. 1970).

As Wife's dental practice consultant for thirteen years, it cannot be disputed that Cain Watters had access to "knowledge of material facts" with regard to the valuation of Wife's practice. And there is nothing in the record to suggest that Cain Watters was unavailable for process. However, it is unclear whether Cain Watters would be naturally inclined to favor Wife simply by virtue of having worked with her in the past. As previously stated, the *Delk* requirements for application of the missing witness rule are to be strictly construed.

Additionally, Husband had access to Cain Watters's valuation figures for the 2000 and 2005 sales. Mr. Hallum included the figures from these transactions in his valuation report and testified that they were instrumental in his own valuation of the practice for purposes of this divorce proceeding. It is not clear what additional information Husband hoped to gain from Cain Watters's testimony. Even assuming an unfavorable inference under the missing witness rule, Mr. Price's valuation is reasonable, and the trial court used its discretion to value the practice within the range of the evidence presented by the parties. The trial court's valuation of the business is not contrary to the preponderance of the evidence. We affirm the trial court's valuation.

## Division of Marital Assets

Husband insists that the trial court abused its discretion in allocating 75% of the marital assets to Wife. Husband claims that he is entitled to "no less than 50% of the net assets." Tenn. Code Ann. § 36-4-121 governs the distribution of marital property. After classifying the property of a divorcing couple, the trial court is charged with equitably dividing the marital property. "Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c).[3] Trial judges

---

[3] Tenn. Code Ann. § 36-4-121(c) instructs the court to consider all relevant factors in making an equitable division of marital property, including the following:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the

(continued...)

-8-

have wide latitude in fashioning an equitable division of marital property, and appellate courts accord great weight to a trial judge's division of marital property." *Kinard*, 986 S.W.2d at 230-31 (citations omitted). Thus, "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results from some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996) (citing *Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994)). More specifically, "we will ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence." *Kinard*, 986 S.W.2d at 231.

Husband first criticizes the trial court's failure to make written findings with regard to the relevant statutory factors, claiming that the factors were "not examined by the court." However, while the court is required to consider all relevant factors under Tenn. Code Ann. § 36-4-121(c), it is not required to make written findings of fact. *Woods v. Woods*, No. M2006-01000-COA-R3-CV, 2007 WL 2198110, at *1-2 (Tenn. Ct. App. July 26, 2007) ("[W]hile it is helpful to a reviewing court if the trial court discusses each of the applicable statutory factors and how those factors impacted its ruling, we will not alter the trial court's decision simply because the trial court failed to do so.").

Husband next claims that the court's division of the marital assets was not equitable. "A division is not rendered inequitable simply because it is not precisely equal, or because each party did not receive a share of every piece of marital property." *Kinard*, 986 S.W.2d at 230 (citations omitted). Rather, the division of a marital estate is guided by consideration

---

[3](...continued)
marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

of the factors of Tenn. Code Ann. § 36-4-121(c). We will outline the facts that are relevant to the Tenn. Code Ann. § 36-4-121(c) analysis below.

The parties' marriage lasted twenty-six years. At the time of trial, Wife was fifty-three and Husband was fifty-one. Both parties were in good physical and mental health. At the time of trial, Wife had just completed physical therapy for an ongoing hip affliction related to her scoliosis which may limit her ability to work full-time in the future. Wife testified that the pain associated with her hip problem required her to spend less time on her feet and that the condition was worsening.

Both parties are well-educated. Wife completed dental school and has a masters degree in pediatric dentistry. Husband has a bachelor's degree with a concentration in business administration and had been employed in the banking industry for more than twenty years. According to the parties' tax returns from 2001 to 2006, Wife earned an average yearly income of approximately $524,280, while Husband earned an average yearly income of approximately $81,362.

In 1983, shortly after they were married and following Wife's graduation from dental school, the parties moved to Murfreesboro so that she could open her dental practice. All of Wife's education was funded exclusively by her parents. Wife had accumulated $84,000 at the time of the parties' marriage by saving money that had been given to her by her parents and grandparents. Wife used money from her savings to buy out the lease from the previous owners of the property which would house her dental practice, as well as to complete renovations on the building before the parties moved to Murfreesboro. Wife estimates that she spent between $17,000 and $20,000 on these costs. Wife also testified that she paid off Husband's credit card bills before they were married and before they shared a joint checking account. Husband testified that this amount was only $250 to $300.

In order to begin her practice, Husband and Wife jointly obtained a line of credit in the amount of $50,000, which was used to purchase equipment. Husband assisted in establishing the initial loan, as well as preparing financial statements for additional loans as the business grew. Wife noted that at the time, as a married female, she was unable to borrow money or buy property without her husband co-signing. Wife agreed at trial that Husband was "an integral part" of obtaining the loans which allowed her to expand the business and make the type of money it eventually made. In terms of Husband's contribution to the preservation of Wife's practice, the parties agreed that he occasionally trimmed the hedges and once put down plastic in the basement to treat a moisture problem. Wife testified that Husband made no direct contribution to improving the property.

There was significant testimony at trial regarding which expenses each party paid throughout the marriage. For the first two or three years of their marriage, the parties had a joint checking account. Thereafter, they used separate checking accounts with Husband's earnings deposited into his account and Wife's earnings deposited into her account. Wife testified that she used earnings from her practice to pay off "a big chunk" of the line of credit in January 1984 and used her personal savings to pay bills and make payroll. Wife stated that she never used the parties' joint account to pay the expenses of her practice. Wife testified that early on, the income that both parties earned was used to pay living expenses, including the mortgage on their home.

Husband's first job upon the parties' relocation to Murfreesboro was with Henley Supply, Wife's father's business. Husband acknowledged that working for Henley Supply worked out well for him in that when he returned to banking, he had a book of customers that he had established through the selling of building supplies. After two or three years of working for Henley Supply, Husband began working for a bank. It was at that point that Husband opened his own checking account and began depositing earnings from his job into that account. Wife continued to deposit her earnings into her own account.

Wife contributed $16,000 or $17,000 to the purchase of the parties' marital home from her separate pre-marital savings in 1983. Wife also paid the mortgage and insurance on the home from her earnings, as well as $160,000 in improvements to the home, including a 1,000 square foot addition, a garden shed, landscaping, an irrigation system, a remodel of three bathrooms, and furnishings. Wife claims that Husband made no financial contribution to the marital home other than being a co-signer on the loan.

The parties' vacation home in Sewanee, Tennessee was also purchased solely by Wife for $850,000 in 2002. Wife paid $125,000 for the down payment and closing costs on the home from her earnings. Husband co-signed on the loan. Wife was also responsible for making the mortgage and insurance payments on the Sewanee residence, which totaled $375,000 during the entirety of the marriage. Husband moved into the Sewanee residence for a time after the parties' separation in 2003 or 2004. When asked about his contribution to the Sewanee home, Husband testified that he had paid utility bills on the property, performed lawn maintenance, trimmed trees, and changed light bulbs.

With respect to the relative ability of each party for future acquisitions of income, Wife acknowledged that her earning capacity substantially exceeds that of Husband and that Husband was not going to earn a similar income to hers. Wife's 2007 income tax return reflected gross income of $538,228. The most recent information regarding Husband's income came from his 2006 tax return, which reflected income of $109,036. At trial,

Husband testified that he made close to $100,000 a year in income during the five and a half years since the parties had separated in 2003.

Husband testified about the tenuous state of the banking industry given the economic climate. He stated that he was concerned about the security of his job, noting that he was "probably the highest paid lender in [his] office." He stated that while he earned the bank money last year, he was still "almost $800,000 off mark what I should have produced."

Wife also expressed concerns about the economy, noting that she had experienced a decrease in business. She stated that fewer patients were coming in and she was having more difficulty collecting. Wife also testified that her practice was facing increased competition in Murfreesboro; two pediatric dentists had opened in the last year and two more were scheduled to open in the next two months. At the time of trial, Wife and her partners were planning to expand their practice to Tullahoma.

Much of the testimony at trial focused on the parties' contribution as parents and homemakers. Wife claims that she served as the primary wage-earner, homemaker, and caregiver to the parties' two children. In 1987, the parties' first son, Willis, was born. The parties hired a nanny to care for him four days a week and to provide domestic help. Wife testified that she was off work and home with Willis the other three days of the week. Wife paid the nanny out of her own personal account. Wife claimed that she was solely responsible for performing all of the familial duties when the nanny was not available, including cooking, cleaning, laundry, and gardening. According to Wife, Husband's only contributions were occasionally mowing the lawn, cleaning the gutters, and picking the children up from school. This routine continued when the parties' second son, Robert, was born in 1989.

Wife claims that Husband had very little involvement in raising the children once they became older. Rather than helping the children with their homework after school, Wife claimed that Husband would spend hours running or biking around the neighborhood after work, then drink beer and listen to music with friends in Nashville an average of three to four nights per week. Robert also testified that Husband went out that frequently. However, Husband disputed the frequency of these activities, stating, "I just don't see how I could have maintained a job and been out three and four nights a week." Neither son thought their father had contributed much in terms of cooking and cleaning at home. Wife claims that Husband's involvement with the children was limited to taking them to a few extracurricular activities and attending their sporting events.

The parties' sons testified at trial and discussed their father's involvement in their lives. They discussed attending sporting events, hunting, and playing together. The parties'

oldest child, Willis, testified, "He's been there. He's been active." Robert also acknowledged that he and his father have a good relationship and that he had profited as an individual from that relationship. Willis testified that his father was "very caring" and "very loving" toward him and Robert. Willis acknowledged having challenged his father about his drinking on one occasion, telling him that he thought it was inappropriate. Husband testified about the many hunting trips he took with his sons and time spent together attending concerts and sporting events. Wife acknowledged Husband's participation in the lives of their children, agreeing that he had taken them to sporting events, attended practices and games, and taken them hunting. Wife conceded that Husband had been involved with their children and their care during the course of the marriage.

Wife claims that she exclusively paid for the children's preschool, aftercare, private school tuition, books, clothing, cell phones, gas, uniforms, vehicles, activity fees, insurance, college tuition, and all miscellaneous expenses. Husband asserted that he also supported the children financially, such as the time Willis ran out of money during a trip to New Orleans and Husband deposited $500 into his account. Willis testified that Husband supported him in the form of "[c]ash, spending money, enough to get breakfast in the morning on the way to school and grab lunch." He estimated that amounted to approximately $50 per week. Husband also provided health insurance for the family during the parties' marriage.

The trial court seemed to place some weight on Husband's alleged failure to provide bank records and expenditures. The trial court stated that Husband "failed to provide any accounting for his earnings except for his 401(k)." The court further noted that Husband "acknowledged that he failed to provide bank records during discovery and he further failed to provide any records of expenditures," as required by Tenn. Code Ann. § 36-4-106(d)(1)(B), which states that "[e]ach party shall maintain records of all expenditures, copies of which shall be available to the other party upon request." Husband asserts that no such request was ever made. Indeed, there is no such request in the record.

Husband claims that the trial court considered fault in making its decision, in violation of Tenn. Code Ann. § 36-4-121(a)(1), which requires that the court equitably divide the marital property without regard to fault. There is no evidence that the trial court considered the fault of Husband in dividing the marital assets. The court discusses Husband's infidelity and anger issues but not in the context of the division of marital assets. Rather, the court offered the following reasons for its division of the marital property: Husband provided no support for the children's private schooling or other necessities, Wife paid the mortgage on the Sewanee home in which Husband resided, Husband turned down the opportunity to stay home with the children when they were first born and Wife assumed the role of caretaker, and Husband did not provide any record of his expenditures as required by statute. The court summarized: "[Wife] built her business, paid the vast majority of all expenses, provided most

-13-

of the care for the children and saved her money. [Husband] pursued his career, played, partied and failed to account for his earnings. Under those circumstances, an equal division of the property is not equitable."

We concur with the trial court. An equal division of marital property is appropriate when an evaluation of the factors in Tenn. Code Ann. § 36-4-121(c) show that the parties are approximately equally situated. In this instance, it is difficult to imagine a marriage where the statutory factors weighed more heavily on one side. Wife was both the primary wage earner and the primary caregiver. She paid the mortgages and insurance on both homes, tuition for private schools, and other major expenses. Husband maintains that he gave the children some spending money, provided health insurance for the family, and took the children biking and hunting. These are laudable actions but quite minor in the context of a 26-year marriage.

We affirm the trial court's division of marital assets.

### Alimony

A trial court has broad discretion to determine the need for spousal support, as well as the appropriate nature, amount, and duration of that support. Tenn. Code Ann. § 36-5-121; *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004). As such, an award of spousal support will not be disturbed on appeal absent an abuse of the trial court's discretion. *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). "Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Kinard*, 986 S.W.2d at 234.

Decisions regarding the nature and amount of spousal support hinge upon the unique facts of each case and require careful consideration of the factors found at Tenn. Code Ann. § 36-5-121(i).[4] *Oakes v. Oakes*, 235 S.W.3d 152, 160 (Tenn. Ct. App. 2007). The single

_____

[4] Tenn. Code Ann. § 36-5-121(i) instructs the court to consider all relevant factors in determining whether spousal support is appropriate and in determining the nature, amount, length of term, and manner of payment, including the following:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and
(continued...)

most important consideration for the court in awarding alimony is the need of the disadvantaged spouse seeking support, followed by the ability of the disadvantaged spouse to pay support. *Id.*

The trial court denied Husband's request for alimony. The court's order stated the following:

> [Husband] also requests alimony on the basis that he is economically disadvantaged because plaintiff earns more money. That is not what is meant by economically disadvantaged. The legislature sets forth the policy basis for alimony in T.C.A. § 36-5-121(c)(1). . . .
>
> In essence, a homemaker who sacrifices career opportunities for the marriage suffers a relative economic disadvantage. [Husband] suffered no relative economic disadvantages. Both [Husband] and [Wife] completed their

---

[4](...continued)
training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

education and began professional careers at the time of the marriage. [Husband] pursued his career unhindered by any marital obligations. He did not subordinate his career for the benefit of the marriage. Since he suffered no relative economic disadvantages, alimony is inappropriate.

Husband asserts that the trial court erred "in its determination that before one could receive alimony one must have foregone working during the course of the marriage." Husband misstates the trial court's reasoning. The court only makes the point that Husband did not suffer "economic detriment" of the kind described in Tenn. Code Ann. § 36-5-121(c)(1) in that he did not subordinate his career in order to focus on "nurturing the personal side of the marriage" or to build "the economic strength of the family unit." Husband's choosing of a career that provides substantial income, but not as substantial as that of Wife, is not a basis for finding an economic disadvantage.

Husband asks this court to award alimony in futuro of at least $10,000 per month. Tennessee law provides four different types of alimony that may be appropriate in combination or alone: rehabilitative alimony, alimony in futuro, transitional alimony, or alimony in solido. Tenn. Code Ann. § 36-5-121(d)(1). There is a statutory bias in favor of temporary, rehabilitative spousal support. Tenn. Code Ann. § 36-5-101(d)(2); *Kinard*, 986 S.W.2d at 234. Rehabilitative alimony is intended to assist the economically disadvantaged spouse "to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse." Tenn. Code Ann. § 36-5-121(d)(2). Rehabilitative alimony is intended to allow "the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient." *Kinard*, 986 S.W.2d at 234. Alimony in futuro, on the other hand, is awarded when there is relative economic disadvantage and rehabilitation is not feasible. Tenn. Code Ann. § 36-5-121(f)(1); *Bowie v. Bowie*, 101 S.W.3d 420, 424 (Tenn. Ct. App. 2002).

Husband asserts that the Tenn. Code Ann. § 36-5-121(i) factors support an award of alimony. Husband notes that Wife earns a great deal more than Husband, and Wife acknowledged at trial that Husband would not ever make as much as she. Husband argues that the trial court's 75/25 division of the marital assets should be particularly persuasive in the alimony determination. Husband also asserts that the parties' standard of living during the marriage points strongly to an award of alimony. Husband claims that it would be impossible for him to enjoy the lifestyle he previously enjoyed without an award of alimony and points out that his requested award of $10,000 per month is less than the amount charged by Wife each month. Husband also claims that he made significant contributions to the

marriage as a parent.  Finally, Husband claims that while the trial court found him to be more at fault, that factor alone does not justify a denial of alimony.

Wife, on the other hand, argues that Husband does not have a need for alimony because he is in good mental and physical health and earned $109,036 in 2006 as the vice president of lending at First Tennessee.  Wife claims that during the parties' five year separation, Husband maintained the same standard of living he enjoyed during the marriage. Additionally, Wife claims that Husband provided "no financial support" to Wife for their children from 2003 until they turned eighteen.  Husband was awarded assets valued at $750,122.75 by the trial court.  In terms of other financial resources, Husband acknowledged that his mother has a $3,000,000 estate, of which he is a one-third beneficiary.  Further, Husband admitted that he purchased a home in 2007 through a trustee, in violation of the statutory restraining order, that he intended to title in his name at the completion of the divorce because he "didn't want [Wife] to get at it."

Wife also points to the income and expense statement that Husband submitted to the court in asserting that he could not meet his existing monthly obligations based on his salary alone.  In that statement, Husband estimated that his "necessary and anticipated" monthly expenses totaled $13,023.90.   At trial, Husband stated that he was no longer incurring a number of those expenses, including cable and internet ($127), automobile payments ($850), clothing replacement for himself ($300), clothing replacement for his children ($108), furniture payments ($2,083), and debt reduction ($3,000).  Deducting those expenses, Husband's estimated monthly expenses total $6,555.90.  Wife points to a number of other questionable expenses on Husband's monthly estimate, including $583.29 for transportation to and from work, $1,500 for vacations, and $325 for work lunches, in addition to $800 for groceries.

Wife focuses heavily on Husband's fault in the marriage.  Fault is an appropriate consideration in the determination of alimony. *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1989).  There was extensive testimony at trial about each party's adultery and about Husband's alleged temper.  Wife accused Husband of emotional and physical abuse, calling her names and threatening her safety.  The parties gave differing accounts of these incidents. Wife stated the following when asked about Husband's behavior when he came home from a night of drinking:

> He had slurred speech and he would just be loud and demanding, and the boys and I learned to just hide from him.  When we heard the car door close or whatever, we would go to our rooms and turn the lights off and act like we had been asleep for a long time and hope he would just turn the TV on go out to the red room and stay out there and not bother us.

Wife testified that this occurred three to four times per week, which was substantiated by the parties' son.

Wife further stated, "I had to be careful not to leave any tools out, especially like screwdrivers or hammers or knives or whatever, because he would grab it up and threaten you with it, you know, (demonstrating) just right in your face with something." Wife testified that she had been threatened with a knife twice: "[H]e was standing in front of the stove and just held [the knife] in front of my face and said 'let's just see how sharp this thing is' or something to threaten." Husband, however, testified that he has "a bad habit" of pointing his finger, and he happened to be doing that with the knife in his hand while chopping something in the kitchen.

Wife testified that Husband had hit her with his open hand and had thrown a pot at her. Husband denied ever having hit Wife. He also denied having thrown a pot although the parties' son Willis also claims to have witnessed that particular incident. Wife did admit to having hit Husband. The parties' other son, Robert, testified about an incident he witnessed: "My mother threw a glass of wine in my father's face after an argument had ensued, and my father pushed my mother against the wall and screamed at her, in her face, and then I left the room." Robert stated that he was concerned about his mother's welfare.

Wife testified that Husband's temper often manifested itself in public:

[T]here were times when he embarrassed me in front of both my family and my colleagues just because he would lose his temper and pick a fight in restaurants. I remember a specific example when we were with a group of people at the Polynesian restaurant in Smyrna, and he and Steve [a friend of the parties'] almost got in a fistfight, to the point where it was, like, meet me out on the street and we will settle this.

Husband, on the other hand, testified that he told Steve that he was not going outside with him, that he was not at fault for the argument, and that the two are good friends. Wife recalled another occasion on which Husband was publicly abusive:

I remember an earlier time when my mom and dad had rented a big cabin up in Gatlinburg for everybody. And in the restaurant [Husband] was verbally and physically abusive, because he was hitting me under the table, and that night he was mean and abusive and called me names.

The trial court found that Wife "proved by a preponderance of the evidence that [Husband] offered indignities to her throughout the marriage in front of family, friends, business associates and strangers."

As for infidelity, Wife admitted to having a "one-night stand in Memphis" in 1991. Husband was also unfaithful during the marriage. Although Husband admitted only that he and his girlfriend became romantically linked after the parties' separation. Husband acknowledged that the two had gone on several vacations together, including trips to Florida, Auburn, North Carolina, University of Tennessee football games, and New Mexico. The trial court found Husband's conduct more reprehensible: "[Husband] further had a continuing open relationship with another woman since the parties' separation. While [Wife] admitted to a one-night sexual affair at a convention 17 or 18 years ago, the conduct was remote and not equal to the fault of [Husband]."

Wife acknowledged that she "withdrew physically, emotionally, mentally" and that she had something to do with the breakup of the marriage. But she testified that she withdrew "subconsciously as a protective mechanism" to protect herself from physical and emotional abuse. Husband admitted to being "50 percent of the fault" in the marriage.

Based on our review of the entire record, we cannot conclude that the trial court abused its discretion in failing to award Husband alimony. The determination hinged, in part, on the trial court's assessment of the relative credibility of the parties. Husband contributed comparatively little to the marital estate financially, and although he did make contributions as a parent, he did not suffer the "economic detriment" described under Tenn. Code Ann. § 36-5-121(c) by subordinating his career in order to make contributions as a homemaker or parent. Husband's actions also played a significant role in the demise of the marriage. Under these circumstances, we affirm the trial court's denial of alimony to Husband.

CONCLUSION

The decision of the trial court is affirmed. Costs of appeal are assessed against the appellant, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE